# ZACCHINI *v.* SCRIPPS-HOWARD BROADCASTING CO.

No. 76–577.   Argued April 25, 1977—Decided June 28, 1977

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, BLACKMUN, and REHNQUIST, JJ., joined. POWELL, J., filed a dissenting opinion, in which BRENNAN and MARSHALL, JJ., joined, *post,* p. 579. STEVENS, J., filed a dissenting opinion, *post,* p. 582.

*John G. Lancione* argued the cause and filed a brief for petitioner.

*Ezra K. Bryan* argued the cause for respondent. With him on the brief were *Don H. Pace* and *Lawrence V. Lindberg.*

MR. JUSTICE WHITE delivered the opinion of the Court.

Petitioner, Hugo Zacchini, is an entertainer. He performs a "human cannonball" act in which he is shot from a cannon into a net some 200 feet away. Each performance occupies some 15 seconds. In August and September 1972, petitioner was engaged to perform his act on a regular basis at the Geauga County Fair in Burton, Ohio. He performed in a fenced area, surrounded by grandstands, at the fair grounds. Members of the public attending the fair were not charged a separate admission fee to observe his act.

On August 30, a freelance reporter for Scripps-Howard Broadcasting Co., the operator of a television broadcasting station and respondent in this case, attended the fair. He

564

carried a small movie camera. Petitioner noticed the reporter and asked him not to film the performance. The reporter did not do so on that day; but on the instructions of the producer of respondent's daily newscast, he returned the following day and videotaped the entire act. This film clip, approximately 15 seconds in length, was shown on the 11 o'clock news program that night, together with favorable commentary.[1]

Petitioner then brought this action for damages, alleging that he is "engaged in the entertainment business," that the act he performs is one "invented by his father and . . . performed only by his family for the last fifty years," that respondent "showed and commercialized the film of his act without his consent," and that such conduct was an "unlawful appropriation of plaintiff's professional property." App. 4-5. Respondent answered and moved for summary judgment, which was granted by the trial court.

The Court of Appeals of Ohio reversed. The majority held that petitioner's complaint stated a cause of action for conversion and for infringement of a common-law copyright, and one judge concurred in the judgment on the ground that the complaint stated a cause of action for appropriation of petitioner's "right of publicity" in the film of his act. All three judges agreed that the First Amendment did not privilege the press to show the entire performance on a news program without compensating petitioner for any financial injury he could prove at trial.

---

[1] The script of the commentary accompanying the film clip read as follows:

"This . . . now . . . is the story of a *true spectator* sport . . . the sport of human cannonballing . . . in fact, the great *Zacchini* is about the only human cannonball around, these days . . . just happens that, *where* he is, is the Great Geauga County Fair, in Burton . . . and believe me, although it's not a *long* act, it's a thriller . . . and you really need to see it *in person* . . . to appreciate it. . . ." (Emphasis in original.) App. 12.

Like the concurring judge in the Court of Appeals, the Supreme Court of Ohio rested petitioner's cause of action under state law on his "right to publicity value of his performance." 47 Ohio St. 2d 224, 351 N. E. 2d 454, 455 (1976). The opinion syllabus, to which we are to look for the rule of law used to decide the case,[2] declared first that one may not use for his own benefit the name or likeness of another, whether or not the use or benefit is a commercial one, and second that respondent would be liable for the appropriation, over petitioner's objection and in the absence of license or privilege, of petitioner's right to the publicity value of his performance. *Ibid.* The court nevertheless gave judgment for respondent because, in the words of the syllabus:

> "A TV station has a privilege to report in its newscasts matters of legitimate public interest which would otherwise be protected by an individual's right of publicity, unless the actual intent of the TV station was to appropriate the benefit of the publicity for some non-privileged private use, or unless the actual intent was to injure the individual." *Ibid.*

We granted certiorari, 429 U. S. 1037 (1977), to consider an issue unresolved by this Court: whether the First and Fourteenth Amendments immunized respondent from damages for its alleged infringement of petitioner's state-law "right of publicity." Pet. for Cert. 2. Insofar as the Ohio Supreme Court held that the First and Fourteenth Amendments of the

---

[2] *Beck* v. *Ohio*, 379 U. S. 89, 93 n. 2 (1964); *Perkins* v. *Benguet Consolidated Mining Co.*, 342 U. S. 437, 441–443 (1952); *Minnesota* v. *National Tea Co.*, 309 U. S. 551, 554 (1940). See *Cassidy* v. *Glossip*, 12 Ohio St. 2d 17, 231 N. E. 2d 64 (1967); *Williamson Heater Co.* v. *Radich*, 128 Ohio St. 124, 190 N. E. 403 (1934); *Thackery* v. *Helfrich*, 123 Ohio St. 334, 336, 175 N. E. 449, 450 (1931); *State* v. *Hauser*, 101 Ohio St. 404, 408, 131 N. E. 66, 67 (1920); 14 Ohio Jur. 2d, Courts § 247 (1955).

United States Constitution required judgment for respondent, we reverse the judgment of that court.

## I

If the judgment below rested on an independent and adequate state ground, the writ of certiorari should be dismissed as improvidently granted, *Wilson* v. *Loew's Inc.*, 355 U. S. 597 (1958), for "[o]ur only power over state judgments is to correct them to the extent that they incorrectly adjudge federal rights. And our power is to correct wrong judgments, not to revise opinions. We are not permitted to render an advisory opinion, and if the same judgment would be rendered by the state court after we corrected its views of federal laws, our review could amount to nothing more than an advisory opinion." *Herb* v. *Pitcairn*, 324 U. S. 117, 125–126 (1945). We are confident, however, that the judgment below did not rest on an adequate and independent state ground and that we have jurisdiction to decide the federal issue presented in this case.

There is no doubt that petitioner's complaint was grounded in state law and that the right of publicity which petitioner was held to possess was a right arising under Ohio law. It is also clear that respondent's claim of constitutional privilege was sustained. The source of this privilege was not identified in the syllabus. It is clear enough from the opinion of the Ohio Supreme Court, which we are permitted to consult for understanding of the syllabus, *Perkins* v. *Benguet Consolidated Mining Co.*, 342 U. S. 437, 441–443 (1952),[3] that in adjudi-

---

[3] In *Perkins* the issue was whether the Ohio courts could exercise personal jurisdiction over a foreign corporation. The syllabus of the Ohio Supreme Court declared that it did not have personal jurisdiction, but it gave no indication of whether the Ohio court's decision rested on state grounds or on the Fourteenth Amendment. The only opinion filed with the syllabus reasoned, however, that the Due Process Clause of the Fourteenth Amendment prohibited the Ohio courts from exercising personal jurisdiction in that case. While recognizing the existence of the Ohio syllabus rule, this Court felt obliged in these circumstances to reach the

cating the crucial question of whether respondent had a privilege to film and televise petitioner's performance, the court placed principal reliance on *Time, Inc.* v. *Hill,* 385 U. S. 374 (1967), a case involving First Amendment limitations on state tort actions. It construed the principle of that case, along with that of *New York Times Co.* v. *Sullivan,* 376 U. S. 254 (1964), to be that "the press has a privilege to report matters of legitimate public interest even though such reports might intrude on matters otherwise private," and concluded, therefore, that the press is also "privileged when an individual seeks to publicly exploit his talents while keeping the benefits private." 47 Ohio St. 2d, at 234, 351 N. E. 2d, at 461. The privilege thus exists in cases "where appropriation of a right of publicity is claimed." The court's opinion also referred to Draft 21 of the relevant portion of Restatement (Second) of Torts (1975), which was understood to make room for reasonable press appropriations by limiting the reach of the right of privacy rather than by creating a privileged invasion. The court preferred the notion of privilege over the Restatement's formulation, however, reasoning that "since the gravamen of the issue in this case is not whether the degree of intrusion is reasonable, but whether *First Amendment principles* require that the

---

merits of the constitutional issue, holding that the Due Process Clause did not preclude the exercise of jurisdiction. "[F]or us to allow the judgment to stand as it is would risk an affirmance of a decision which might have been decided differently if the court below had felt free, under our decisions, to do so." 342 U. S., at 443.

The Ohio courts do not suggest that the opinion is not relevant to a determination of the Ohio Supreme Court's holding.

"The syllabus is the language of the court. The opinion is more particularly the language of the judge preparing the same, and yet *so much of the opinion as is reasonably necessary to sustain the judgment must of necessity be concurred in by the court."* *Hart* v. *Andrews,* 103 Ohio St. 218, 221, 132 N. E. 846, 847 (1921) (emphasis added).

See also *Williamson Heater Co., supra; State* v. *Hauser, supra.*

right of privacy give way to the public right to be informed of matters of public interest and concern, the concept of privilege seems the more useful and appropriate one." 47 Ohio St. 2d, at 234 n. 5, 351 N. E. 2d, at 461 n. 5. (Emphasis added.)

Had the Ohio court rested its decision on both state and federal grounds, either of which would have been dispositive, we would have had no jurisdiction. *Fox Film Corp.* v. *Muller,* 296 U. S. 207 (1935); *Enterprise Irrigation Dist.* v. *Farmers Mutual Canal Co.,* 243 U. S. 157, 164 (1917). But the opinion, like the syllabus, did not mention the Ohio Constitution, citing instead this Court's First Amendment cases as controlling. It appears to us that the decision rested solely on federal grounds. That the Ohio court might have, but did not, invoke state law does not foreclose jurisdiction here. *Steele* v. *Louisville & Nashville R. Co.,* 323 U. S. 192, 197 n. 1 (1944); *Indiana ex rel. Anderson* v. *Brand,* 303 U. S. 95, 98 (1938).

Even if the judgment in favor of respondent must nevertheless be understood as ultimately resting on Ohio law, it appears that at the very least the Ohio court felt compelled by what it understood to be federal constitutional considerations to construe and apply its own law in the manner it did. In this event, we have jurisdiction and should decide the federal issue; for if the state court erred in its understanding of our cases and of the First and Fourteenth Amendments, we should so declare, leaving the state court free to decide the privilege issue solely as a matter of Ohio law. *Perkins* v. *Benguet Consolidated Mining Co., supra.* If the Supreme Court of Ohio "held as it did because it felt under compulsion of federal law as enunciated by this Court so to hold, it should be relieved of that compulsion. It should be freed to decide . . . these suits according to its own local law." *Missouri ex rel. Southern R. Co.* v. *Mayfield,* 340 U. S. 1, 5 (1950).

## II

The Ohio Supreme Court held that respondent is constitutionally privileged to include in its newscasts matters of public interest that would otherwise be protected by the right of publicity, absent an intent to injure or to appropriate for some nonprivileged purpose. If under this standard respondent had merely reported that petitioner was performing at the fair and described or commented on his act, with or without showing his picture on television, we would have a very different case. But petitioner is not contending that his appearance at the fair and his performance could not be reported by the press as newsworthy items. His complaint is that respondent filmed his entire act and displayed that film on television for the public to see and enjoy. This, he claimed, was an appropriation of his professional property. The Ohio Supreme Court agreed that petitioner had "a right of publicity" that gave him "personal control over commercial display and exploitation of his personality and the exercise of his talents."[4] This right of "exclusive control over the publicity given to his performances" was said to be such a "valuable part of the benefit which may be attained by his talents and efforts" that it was entitled to legal protection. It was

---

[4] The court relied on *Housh* v. *Peth,* 165 Ohio St. 35, 133 N. E. 2d 340, 341 (1956), the syllabus of which held:

"An actionable invasion of the right of privacy is the unwarranted appropriation or exploitation of one's personality, the publicizing of one's private affairs with which the public has no legitimate concern, or the wrongful intrusion into one's private activities in such a manner as to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities."

The court also indicated that the applicable principles of Ohio law were those set out in Restatement (Second) § 652C of Torts (Tent. Draft No. 13, 1967), and the comments thereto, portions of which were stated in the footnotes of the opinion. Also, referring to the right as the "right of publicity," the court quoted approvingly from *Haelan Laboratories, Inc.* v. *Topps Chewing Gum, Inc.,* 202 F. 2d 866, 868 (CA2 1953).

also observed, or at least expressly assumed, that petitioner had not abandoned his rights by performing under the circumstances present at the Geauga County Fair Grounds.

The Ohio Supreme Court nevertheless held that the challenged invasion was privileged, saying that the press "must be accorded broad latitude in its choice of how much it presents of each story or incident, and of the emphasis to be given to such presentation. No fixed standard which would bar the press from reporting or depicting either an entire occurrence or an entire discrete part of a public performance can be formulated which would not unduly restrict the 'breathing room' in reporting which freedom of the press requires." 47 Ohio St. 2d, at 235, 351 N. E. 2d, at 461. Under this view, respondent was thus constitutionally free to film and display petitioner's entire act.[5]

The Ohio Supreme Court relied heavily on *Time, Inc.* v. *Hill,* 385 U. S. 374 (1967), but that case does not mandate a media privilege to televise a performer's entire act without his consent. Involved in *Time, Inc.* v. *Hill* was a claim under the New York "Right of Privacy" statute [6] that Life Magazine, in

---

[5] The court's explication was as follows:

"The proper standard must necessarily be whether the matters reported were of public interest, and if so, the press will be liable for appropriation of a performer's right of publicity only if its actual intent was not to report the performance, but, rather, to appropriate the performance for some other private use, or if the actual intent was to injure the performer. It might also be the case that the press would be liable if it recklessly disregarded contract rights existing between the plaintiff and a third person to present the performance to the public, but that question is not presented here." 47 Ohio St. 2d, at 235, 351 N. E. 2d, at 461.

[6] Section 51 of the New York Civil Rights Law (McKinney 1976) provides an action for injunction and damages for invasion of the "right of privacy" granted by § 50:

"A person, firm or corporation that uses for advertising purposes, or for the purposes of trade, the name, portrait or picture of any living person without having first obtained the written consent of such person, or if a minor of his or her parent or guardian, is guilty of a misdemeanor."

the course of reviewing a new play, had connected the play with a long-past incident involving petitioner and his family and had falsely described their experience and conduct at that time. The complaint sought damages for humiliation and suffering flowing from these nondefamatory falsehoods that allegedly invaded Hill's privacy. The Court held, however, that the opening of a new play linked to an actual incident was a matter of public interest and that Hill could not recover without showing that the Life report was knowingly false or was published with reckless disregard for the truth—the same rigorous standard that had been applied in *New York Times Co.* v. *Sullivan,* 376 U. S. 254 (1964).

*Time, Inc.* v. *Hill,* which was hotly contested and decided by a divided Court, involved an entirely different tort from the "right of publicity" recognized by the Ohio Supreme Court. As the opinion reveals in *Time, Inc.* v. *Hill,* the Court was steeped in the literature of privacy law and was aware of the developing distinctions and nuances in this branch of the law. The Court, for example, cited W. Prosser, Law of Torts 831–832 (3d ed. 1964), and the same author's well-known article, Privacy, 48 Calif. L. Rev. 383 (1960), both of which divided privacy into four distinct branches.[7] The Court was aware that it was adjudicating a "false light" privacy case involving a matter of public interest, not a case involving "intrusion," 385 U. S., at 384–385, n. 9, "appropriation" of a

---

[7] "The law of privacy comprises four distinct kinds of invasion of four different interests of the plaintiff, which are tied together by the common name, but otherwise have almost nothing in common except that each represents an interference with the right of the plaintiff . . . 'to be let alone.'" Prosser, Privacy, 48 Calif. L. Rev., at 389. Thus, according to Prosser, some courts had recognized a cause of action for "intrusion" upon the plaintiff's seclusion or solitude; public disclosure of "private facts" about the plaintiff's personal life; publicity that places the plaintiff in a "false light" in the public eye; and "appropriation" of the plaintiff's name or likeness for commercial purposes. One may be liable for "appropriation" if he "pirate[s] the plaintiff's identity for some advantage of his own." *Id.,* at 403.

name or likeness for the purposes of trade, *id.*, at 381, or "private details" about a non-newsworthy person or event, *id.*, at 383 n. 7. It is also abundantly clear that *Time, Inc.* v. *Hill* did not involve a performer, a person with a name having commercial value, or any claim to a "right of publicity." This discrete kind of "appropriation" case was plainly identified in the literature cited by the Court [8] and had been adjudicated in the reported cases.[9]

---

[8] See, for example, W. Prosser, Law of Torts 842 (3d ed. 1964); Bloustein, Privacy as an Aspect of Human Dignity: An Answer to Dean Prosser, 39 N. Y. U. L. Rev. 962, 986–991 (1964); Kalven, Privacy in Tort Law—Were Warren and Brandeis Wrong?, 31 Law & Contemp. Prob. 326, 331 (1966).

[9] *E. g., Ettore* v. *Philco Television Broadcasting Corp.,* 229 F. 2d 481 (CA3), cert. denied, 351 U. S. 926 (1956); *Sharkey* v. *National Broadcasting Co.,* 93 F. Supp. 986 (SDNY 1950); *Pittsburgh Athletic Co.* v. *KQV Broadcasting Co.,* 24 F. Supp. 490 (WD Pa. 1938); *Twentieth Century Sporting Club, Inc.* v. *Transradio Press Service,* 165 Misc. 71, 300 N. Y. S. 159 (1937); *Hogan* v. *A. S. Barnes & Co.,* 114 U. S. P. Q. 314 (Pa. Ct. C. P. 1957); *Myers* v. *U. S. Camera Publishing Corp.,* 9 Misc. 2d 765, 167 N. Y. S. 2d 771 (1957). The cases prior to 1961 are helpfully reviewed in Gordon, Right of Property in Name, Likeness, Personality and History, 55 Nw. U. L. Rev. 553 (1960).

*Ettore* v. *Philco Television Broadcasting Corp., supra,* involved a challenge to television exhibition of a film made of a prize fight that had occurred some time ago. Judge Biggs, writing for the Court of Appeals, said:

"There are, speaking very generally, two polar types of cases. One arises when some accidental occurrence rends the veil of obscurity surrounding an average person and makes him, arguably, newsworthy. The other type involves the appropriation of the performance or production of a professional performer or entrepreneur. Between the two extremes are many gradations, most involving strictly commercial exploitation of some aspect of an individual's personality, such as his name or picture." 229 F. 2d, at 486.

". . . The fact is that, if a performer performs for hire, a curtailment, without consideration, of his right to control his performance is a wrong to him. Such a wrong vitally affects his livelihood, precisely as a trade

The differences between these two torts are important. First, the State's interests in providing a cause of action in each instance are different. "The interest protected" in permitting recovery for placing the plaintiff in a false light "is clearly that of reputation, with the same overtones of mental distress as in defamation." Prosser, *supra,* 48 Calif. L. Rev., at 400. By contrast, the State's interest in permitting a "right of publicity" is in protecting the proprietary interest of the individual in his act in part to encourage such entertainment.[10] As we later note, the State's interest is closely analogous to the goals of patent and copyright law, focusing on the right of the individual to reap the reward of his endeavors and having little to do with protecting feelings or reputation. Second, the two torts differ in the degree to which they intrude on dissemination of information to the public. In "false light" cases the only way to protect the interests involved is to attempt to minimize publication of the damaging matter, while in "right of publicity" cases the only question is who gets to do the publishing. An entertainer such as petitioner usually has no objection to the widespread publication of his act as long as he gets the commercial benefit of such publication. Indeed, in the present case petitioner did not seek to enjoin the broadcast of his act; he simply

---

libel, for example, affects the earnings of a corporation. If the artistry of the performance be used as a criterion, every judge perforce must turn himself into a literary, theatrical or sports critic." *Id.,* at 490.

[10] The Ohio Supreme Court expressed the view "that plaintiff's claim is one for invasion of the right of privacy by appropriation, and should be considered as such." 47 Ohio St. 2d, at 226, 351 N. E. 2d, at 456. It should be noted, however, that the case before us is more limited than the broad category of lawsuits that may arise under the heading of "appropriation." Petitioner does not merely assert that some general use, such as advertising, was made of his name or likeness; he relies on the much narrower claim that respondent televised an entire act that he ordinarily gets paid to perform.

sought compensation for the broadcast in the form of damages.

Nor does it appear that our later cases, such as *Rosenbloom* v. *Metromedia, Inc.*, 403 U. S. 29 (1971); *Gertz* v. *Robert Welch, Inc.*, 418 U. S. 323 (1974); and *Time, Inc.* v. *Firestone*, 424 U. S. 448 (1976), require or furnish substantial support for the Ohio court's privilege ruling. These cases, like *New York Times*, emphasize the protection extended to the press by the First Amendment in defamation cases, particularly when suit is brought by a public official or a public figure. None of them involve an alleged appropriation by the press of a right of publicity existing under state law.

Moreover, *Time, Inc.* v. *Hill, New York Times, Metromedia, Gertz,* and *Firestone* all involved the reporting of events; in none of them was there an attempt to broadcast or publish an entire act for which the performer ordinarily gets paid. It is evident, and there is no claim here to the contrary, that petitioner's state-law right of publicity would not serve to prevent respondent from reporting the newsworthy facts about petitioner's act.[11] Wherever the line in particular situations is to be drawn between media reports that are protected and

---

[11] W. Prosser, Law of Torts 806–807 (4th ed. 1971), generalizes on the cases:

"The New York courts were faced very early with the obvious fact that newspapers and magazines, to say nothing of radio, television and motion pictures, are by no means philanthropic institutions, but are operated for profit. As against the contention that everything published by these agencies must necessarily be 'for purposes of trade,' they were compelled to hold that there must be some closer and more direct connection, beyond the mere fact that the newspaper itself is sold; and that the presence of advertising matter in adjacent columns, or even the duplication of a news item for the purpose of advertising the publication itself, does not make any difference. Any other conclusion would in all probability have been an unconstitutional interference with the freedom of the press. Accordingly, it has been held that the mere incidental mention of the plaintiff's name in a book or a motion picture is not an invasion of his privacy; nor

those that are not, we are quite sure that the First and Fourteenth Amendments do not immunize the media when they broadcast a performer's entire act without his consent. The Constitution no more prevents a State from requiring respondent to compensate petitioner for broadcasting his act on television than it would privilege respondent to film and broadcast a copyrighted dramatic work without liability to the copyright owner, Copyrights Act, 17 U. S. C. App. § 101 *et seq.* (1976 ed.); cf. *Kalem Co.* v. *Harper Bros.*, 222 U. S. 55 (1911); *Manners* v. *Morosco*, 252 U. S. 317 (1920), or to film and broadcast a prize fight, *Ettore* v. *Philco Television Broadcasting Corp.*, 229 F. 2d 481 (CA3), cert. denied, 351 U. S. 926 (1956); or a baseball game, *Pittsburgh Athletic Co.* v. *KQV Broadcasting Co.*, 24 F. Supp. 490 (WD Pa. 1938), where the promoters or the participants had other plans for publicizing the event. There are ample reasons for reaching this conclusion.

The broadcast of a film of petitioner's entire act poses a substantial threat to the economic value of that performance. As the Ohio court recognized, this act is the product of petitioner's own talents and energy, the end result of much time, effort, and expense. Much of its economic value lies in the "right of exclusive control over the publicity given to his performance"; if the public can see the act free on television, it will be less willing to pay to see it at the fair.[12] The

---

is the publication of a photograph or a newsreel in which he incidentally appears." (Footnotes omitted.)

Cf. Restatement (Second) of Torts § 652C, Comment *d* (Tent. Draft No. 22, 1976).

[12] It is possible, of course, that respondent's news broadcast increased the value of petitioner's performance by stimulating the public's interest in seeing the act live. In these circumstances, petitioner would not be able to prove damages and thus would not recover. But petitioner has alleged that the broadcast injured him to the extent of $25,000, App. 5, and we think the State should be allowed to authorize compensation of this injury if proved.

effect of a public broadcast of the performance is similar to preventing petitioner from charging an admission fee. "The rationale for [protecting the right of publicity] is the straight-forward one of preventing unjust enrichment by the theft of good will. No social purpose is served by having the defendant get free some aspect of the plaintiff that would have market value and for which he would normally pay." Kalven, Privacy in Tort Law—Were Warren and Brandeis Wrong?, 31 Law & Contemp. Prob. 326, 331 (1966). Moreover, the broadcast of petitioner's entire performance, unlike the unauthorized use of another's name for purposes of trade or the incidental use of a name or picture by the press, goes to the heart of petitioner's ability to earn a living as an entertainer. Thus, in this case, Ohio has recognized what may be the strongest case for a "right of publicity"—involving, not the appropriation of an entertainer's reputation to enhance the attractiveness of a commercial product, but the appropriation of the very activity by which the entertainer acquired his reputation in the first place.

Of course, Ohio's decision to protect petitioner's right of publicity here rests on more than a desire to compensate the performer for the time and effort invested in his act; the protection provides an economic incentive for him to make the investment required to produce a performance of interest to the public. This same consideration underlies the patent and copyright laws long enforced by this Court. As the Court stated in *Mazer* v. *Stein,* 347 U. S. 201, 219 (1954):

"The economic philosophy behind the clause empowering Congress to grant patents and copyrights is the conviction that encouragement of individual effort by personal gain is the best way to advance public welfare through the talents of authors and inventors in 'Science and useful Arts.' Sacrificial days devoted to such creative activities deserve rewards commensurate with the services rendered."

These laws perhaps regard the "reward to the owner [as] a secondary consideration," *United States* v. *Paramount Pictures,* 334 U. S. 131, 158 (1948), but they were "intended definitely to grant valuable, enforceable rights" in order to afford greater encouragement to the production of works of benefit to the public. *Washingtonian Publishing Co.* v. *Pearson,* 306 U. S. 30, 36 (1939). The Constitution does not prevent Ohio from making a similar choice here in deciding to protect the entertainer's incentive in order to encourage the production of this type of work. Cf. *Goldstein* v. *California,* 412 U. S. 546 (1973); *Kewanee Oil Co.* v. *Bicron Corp.,* 416 U. S. 470 (1974).[13]

---

[13] *Goldstein* involved a California statute outlawing "record piracy"—the unauthorized duplication of recordings of performances by major musical artists. Petitioners there launched a multifaceted constitutional attack on the statute, but they did not argue that the statute violated the First Amendment. In rejecting this broad-based constitutional attack, the Court concluded:

"The California statutory scheme evidences a legislative policy to prohibit 'tape piracy' and 'record piracy,' conduct that may adversely affect the continued production of new recordings, a large industry in California. Accordingly, the State has, by statute, given to recordings the attributes of property. *No restraint has been placed on the use of an idea or concept;* rather, petitioners and other individuals remain free to record the same compositions in precisely the same manner and with the same personnel as appeared on the original recording.

. . . . .

"Until and unless Congress takes further action with respect to recordings . . . , the California statute may be enforced against acts of piracy such as those which occurred in the present case." 412 U. S., at 571. (Emphasis added.)

We note that Federal District Courts have rejected First Amendment challenges to the federal copyright law on the ground that "no restraint [has been] placed on the use of an idea or concept." *United States* v. *Bodin,* 375 F. Supp. 1265, 1267 (WD Okla. 1974). See also *Walt Disney Productions* v. *Air Pirates,* 345 F. Supp. 108, 115–116 (ND Cal. 1972) (citing Nimmer, Does Copyright Abridge The First Amendment Guaran-

There is no doubt that entertainment, as well as news, enjoys First Amendment protection. It is also true that entertainment itself can be important news. *Time, Inc.* v. *Hill*. But it is important to note that neither the public nor respondent will be deprived of the benefit of petitioner's performance as long as his commercial stake in his act is appropriately recognized. Petitioner does not seek to enjoin the broadcast of his performance; he simply wants to be paid for it. Nor do we think that a state-law damages remedy against respondent would represent a species of liability without fault contrary to the letter or spirit of *Gertz* v. *Robert Welch, Inc.*, 418 U. S. 323 (1974). Respondent knew that petitioner objected to televising his act but nevertheless displayed the entire film.

We conclude that although the State of Ohio may as a

---

tees of Free Speech and Press?, 17 UCLA L. Rev. 1180 (1970), who argues that copyright law does not abridge the First Amendment because it does not restrain the communication of ideas or concepts); *Robert Stigwood Group Ltd.* v. *O'Reilly*, 346 F. Supp. 376 (Conn. 1972) (also relying on Nimmer, *supra*). Of course, this case does not involve a claim that respondent would be prevented by petitioner's "right of publicity" from staging or filming its own "human cannonball" act.

In *Kewanee* this Court upheld the constitutionality of Ohio's trade-secret law, although again no First Amendment claim was presented. Citing *Goldstein*, the Court stated:

"Just as the States may exercise regulatory power over writings so may the States regulate with respect to discoveries. States may hold diverse viewpoints in protecting intellectual property relating to invention as they do in protecting the intellectual property relating to the subject matter of copyright. The only limitation on the States is that in regulating the area of patents and copyrights they do not conflict with the operation of the laws in this area passed by Congress . . . ." 416 U. S., at 479.

Although recognizing that the trade-secret law resulted in preventing the public from gaining certain information, the Court emphasized that the law had "a decidedly beneficial effect on society," *id.*, at 485, and that without it, "organized scientific and technological research could become fragmented, and society, as a whole, would suffer." *Id.*, at 486.

matter of its own law privilege the press in the circumstances of this case, the First and Fourteenth Amendments do not require it to do so.

*Reversed.*

MR. JUSTICE POWELL, with whom MR. JUSTICE BRENNAN and MR. JUSTICE MARSHALL join, dissenting.

Disclaiming any attempt to do more than decide the narrow case before us, the Court reverses the decision of the Supreme Court of Ohio based on repeated incantation of a single formula: "a performer's entire act." The holding today is summed up in one sentence:

> "Wherever the line in particular situations is to be drawn between media reports that are protected and those that are not, we are quite sure that the First and Fourteenth Amendments do not immunize the media when they broadcast a performer's entire act without his consent." *Ante,* at 574–575.

I doubt that this formula provides a standard clear enough even for resolution of this case.[1] In any event, I am not persuaded that the Court's opinion is appropriately sensitive

---

[1] Although the record is not explicit, it is unlikely that the "act" commenced abruptly with the explosion that launched petitioner on his way, ending with the landing in the net a few seconds later. One may assume that the actual firing was preceded by some fanfare, possibly stretching over several minutes, to heighten the audience's anticipation: introduction of the performer, description of the uniqueness and danger, last-minute checking of the apparatus, and entry into the cannon, all accompanied by suitably ominous commentary from the master of ceremonies. If this is found to be the case on remand, then respondent could not be said to have appropriated the "entire act" in its 15-second newsclip— and the Court's opinion then would afford no guidance for resolution of the case. Moreover, in future cases involving different performances, similar difficulties in determining just what constitutes the "entire act" are inevitable.

to the First Amendment values at stake, and I therefore dissent.

Although the Court would draw no distinction, *ante,* at 575, I do not view respondent's action as comparable to unauthorized commercial broadcasts of sporting events, theatrical performances, and the like where the broadcaster keeps the profits. There is no suggestion here that respondent made any such use of the film. Instead, it simply reported on what petitioner concedes to be a newsworthy event, in a way hardly surprising for a television station— by means of film coverage. The report was part of an ordinary daily news program, consuming a total of 15 seconds. It is a routine example of the press' fulfilling the informing function so vital to our system.

The Court's holding that the station's ordinary news report may give rise to substantial liability [2] has disturbing implications, for the decision could lead to a degree of media self-censorship. Cf. *Smith* v. *California,* 361 U. S. 147, 150– 154 (1959). Hereafter, whenever a television news editor is unsure whether certain film footage received from a camera crew might be held to portray an "entire act," [3] he may

---

[2] At some points the Court seems to acknowledge that the reason for recognizing a cause of action asserting a "right of publicity" is to prevent unjust enrichment. See, *e. g., ante,* at 576. But the remainder of the opinion inconsistently accepts a measure of damages based not on the defendant's enhanced profits but on harm to the plaintiff regardless of any gain to the defendant. See, *e. g., ante,* at 575 n. 12. Indeed, in this case there is no suggestion that respondent television station gained financially by showing petitioner's flight (although it no doubt received its normal advertising revenue for the news program—revenue it would have received no matter which news items appeared). Nevertheless, in the unlikely event that petitioner can prove that his income was somehow reduced as a result of the broadcast, respondent will apparently have to compensate him for the difference.

[3] Such doubts are especially likely to arise when the editor receives film footage of an event at a local fair, a circus, a sports competition of limited

decline coverage—even of clearly newsworthy events—or confine the broadcast to watered-down verbal reporting, perhaps with an occasional still picture. The public is then the loser. This is hardly the kind of news reportage that the First Amendment is meant to foster. See generally *Miami Herald Publishing Co.* v. *Tornillo,* 418 U. S. 241, 257–258 (1974); *Time, Inc.* v. *Hill,* 385 U. S. 374, 389 (1967); *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 270–272, 279 (1964).

In my view the First Amendment commands a different analytical starting point from the one selected by the Court. Rather than begin with a quantitative analysis of the performer's behavior—is this or is this not his entire act?—we should direct initial attention to the actions of the news media: what use did the station make of the film footage? When a film is used, as here, for a routine portion of a regular news program, I would hold that the First Amendment protects the station from a "right of publicity" or "appropriation" suit, absent a strong showing by the plaintiff that the news broadcast was a subterfuge or cover for private or commercial exploitation.[4]

I emphasize that this is a "reappropriation" suit, rather than one of the other varieties of "right of privacy" tort suits identified by Dean Prosser in his classic article. Prosser, Privacy, 48 Calif. L. Rev. 383 (1960). In those other causes

---

duration (*e. g.,* the winning effort in a ski-jump competition), or a dramatic production made up of short skits, to offer only a few examples.

[4] This case requires no detailed specification of the standards for identifying a subterfuge, since there is no claim here that respondent's news use was anything but bona fide. Cf. 47 Ohio St. 2d 224, 351 N. E. 2d 454, 455 (the standards suggested by the Supreme Court of Ohio, quoted *ante,* at 565). I would point out, however, that selling time during a news broadcast to advertisers in the customary fashion does not make for "commercial exploitation" in the sense intended here. See W. Prosser, Law of Torts 806–807 (4th ed. 1971). Cf. *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 266 (1964).

of action the competing interests are considerably different. The plaintiff generally seeks to avoid any sort of public exposure, and the existence of constitutional privilege is therefore less likely to turn on whether the publication occurred in a news broadcast or in some other fashion. In a suit like the one before us, however, the plaintiff does not complain about the fact of exposure to the public, but rather about its timing or manner. He welcomes some publicity, but seeks to retain control over means and manner as a way to maximize for himself the monetary benefits that flow from such publication. But having made the matter public—having chosen, in essence, to make it newsworthy—he cannot, consistent with the First Amendment, complain of routine news reportage. Cf. *Gertz* v. *Robert Welch, Inc.,* 418 U. S. 323, 339–348, 351–352 (1974) (clarifying the different liability standards appropriate in defamation suits, depending on whether or not the plaintiff is a public figure).

Since the film clip here was undeniably treated as news and since there is no claim that the use was subterfuge, respondent's actions were constitutionally privileged. I would affirm.

MR. JUSTICE STEVENS, dissenting.

The Ohio Supreme Court held that respondent's telecast of the "human cannonball" was a privileged invasion of petitioner's common-law "right of publicity" because respondent's actual intent was neither (a) to appropriate the benefit of the publicity for a private use, nor (b) to injure petitioner.*

---

*Paragraph 3 of the court's syllabus, 47 Ohio St. 2d 224, 351 N. E. 2d 454, 455, reads as follows:

"A TV station has a privilege to report in its newscasts matters of legitimate public interest which would otherwise be protected by an individual's right of publicity, unless the actual intent of the TV station was to

As I read the state court's explanation of the limits on the concept of privilege, they define the substantive reach of a common-law tort rather than anything I recognize as a limit on a federal constitutional right. The decision was unquestionably influenced by the Ohio court's proper sensitivity to First Amendment principles, and to this Court's cases construing the First Amendment; indeed, I must confess that the opinion can be read as resting entirely on federal constitutional grounds. Nevertheless, the basis of the state court's action is sufficiently doubtful that I would remand the case to that court for clarification of its holding before deciding the federal constitutional issue.

---

appropriate the benefit of the publicity for some non-privileged private use, or unless the actual intent was to injure the individual."

In its opinion, the court described the "proper standard" in language which I read as defining the boundaries of a common-law tort:

"The proper standard must necessarily be whether the matters reported were of public interest, and if so, the press will be liable for appropriation of a performer's right of publicity only if its actual intent was not to report the performance, but, rather, to appropriate the performance for some other private use, or if the actual intent was to injure the performer. It might also be the case that the press would be liable if it recklessly disregarded contract rights existing between the plaintiff and a third person to present the performance to the public, but that question is not presented here." *Id.*, at 235, 351 N. E. 2d, at 461.