

FILED

Oct 24 2018, 3:10 pm

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



IN THE

# Indiana Supreme Court

Supreme Court Case No. 18S-CQ-00134

## Akeem Daniels, Cameron Stingily, and Nicholas Stoner

*Plaintiffs-Appellants*

–v–

## FanDuel, Inc. and DraftKings, Inc.

*Defendants-Appellees*

Argued: June 28, 2018 | Decided: October 24, 2018

Certified Question from the U.S. Court of Appeals for the Seventh Circuit
Case No. 17-3051
The Honorable Frank H. Easterbrook, Judge

**Opinion by Justice David**
Chief Justice Rush and Justices Massa, Slaughter, and Goff concur.

**David, Justice**

Indiana's right of publicity statute provides, "a person may not use an aspect of a personality's right of publicity for a commercial purpose... without having obtained previous written consent." Ind. Code § 32-36-1-8(a). Pursuant to Indiana Appellate Rule 64, our Court accepted a certified question from the United States Court of Appeals for the Seventh Circuit, which asked:

> Whether online fantasy-sports operators that condition entry on payment, and distribute cash prizes, need the consent of players whose names, pictures, and statistics are used in the contests, in advertising the contests, or both.

In short, we answer this question narrowly and find online fantasy sports operators that condition entry to contests on payment and distribute cash prizes do not violate the Indiana right of publicity statute when those organizations use the names, pictures, and statistics of players without their consent because the use falls within the meaning of "material that has newsworthy value," an exception under the statute.

# Facts and Procedural History

Plaintiff-Appellants Akeem Daniels, Cameron Stingily, and Nicholas Stoner were collegiate student–athletes at various times between 2014-2016. The players' on-field performances were collected as numerical statistics and published by various fantasy sports website operators including Defendants-Appellees DraftKings, Inc. and FanDuel, Inc. Consumers wishing to use Defendants' products could pay a fee to access detailed information such as Plaintiffs' names, images, and statistics, assess the athletes' weekly performances, and assemble a virtual team of real-life athletes to compete against other users' teams on the Defendants' websites.

To participate in Defendants' fantasy sports competitions, consumers were required to follow certain rules imposed by the Defendants. For

example, Defendants assigned a fictional dollar value to each Plaintiff based on the player's statistics and overall performance. To prevent a consumer from assembling a team composed only of the league's best players, each consumer's fantasy team was subjected to an overall salary cap. Each athlete's performance on the field translated to a point value determined by Defendants. At the end of a designated period, consumers were eligible to win cash prizes based on the points accumulated by their fantasy sports team.

Plaintiffs filed a class action complaint against Defendants in Marion County alleging that Defendants "used their names and likenesses in operating and promoting online fantasy sports contests without Plaintiffs' consent, and that doing so was a violation of their right of publicity under Indiana law." *Daniels v. FanDuel, Inc.*, 2017 WL 4340329, at *1 (S.D. Ind. Sept. 29, 2017). Defendants removed the case to the U.S. District Court for the Southern District of Indiana and moved to dismiss, arguing that Plaintiffs failed to state a claim upon which relief could be granted because the use of Plaintiffs' names and statistics fell under certain statutory exceptions to the right of publicity. *Id*. The District Court dismissed the suit, finding no violation of Plaintiffs' right of publicity because the use of their likenesses was in material that had newsworthy value and was a matter of public interest under the exceptions in Indiana Code section 32-36-1-1(c). *Id*., at *7, *9. Plaintiffs appealed to the Seventh Circuit Court of Appeals, which certified a question of Indiana law to this Court. *Daniels v. FanDuel, Inc.*, 884 F.3d 672, 674 (7th Cir. 2018).

## Discussion

The parties in this case ask us to consider a wide range of issues touching on the right of publicity and its implications in our State. We recognize at the onset that our decision will carry considerable weight not only with respect to these parties, but for other potential right of publicity litigants in our state courts. We also understand that certain factual determinations and allegations remain unresolved and are squarely within the jurisdiction of our federal colleagues. We therefore proceed cautiously, maintaining a narrow focus on the question before us.

To maintain this narrow focus, we begin with a brief overview of the statutory scheme for the right of publicity.  We then examine in detail the "newsworthy value" exception to the statute, finding that certain principles of statutory construction inform our reading of that exception.  Through this lens, we next analyze the spectrum of "material that has newsworthy value" to evaluate the parties' arguments.  The conclusions we draw from this analysis lead to the ultimate result that the use of players' names, pictures, and statistics in fantasy sports contests do not violate the right of publicity in Indiana.

## The Statute

We turn first to the right of publicity statute, including its pertinent definitions and exceptions.  Since its enactment in 1994 and recodification in 2002, the statutory right of publicity in Indiana has remained largely untouched.[1]  *See, e.g.*, H.E.A. 1258, 117th Gen. Assemb., 2d Reg. Sess. (Ind. 2012) (adding an exception for a personality that has commercial value solely because that personality has been charged with or convicted of a crime and clarifying the chapter's application to rights of a deceased personality).  Be that as it may, our Court has never had the opportunity to review Indiana's right of publicity statute.

In relevant part, the statute provides, "a person may not use an aspect of a personality's right of publicity for a commercial purpose during the personality's lifetime or for one hundred (100) years after the date of the personality's death without having obtained previous written consent."  Ind. Code § 32-36-1-8(a).  The right of publicity is defined as "a personality's property interest in the personality's (1) name; (2) voice; (3) signature; (4) photograph; (5) image; (6) likeness; (7) distinctive

---

[1] Indiana is not unique in identifying a right of publicity.  Other states have also recognized this right either in statute, through the common law, or both.  *See, e.g.*, N.Y. Civ. Rights Law § 51, *Brown v. Ames*, 201 F.3d 654, 657-58 (5th Cir. 2000) (discussing a common law right of publicity in Texas), and *Gionfriddo v. Major League Baseball*, 114 Cal.Rptr.2d 307, 312 (Cal. Ct. App. 2001) (recognizing that California's right of publicity is both a common law and a statutory right).

appearance; (8) gestures; or (9) mannerisms." Ind. Code § 32-36-1-7. A person who violates this right of publicity may be liable for damages. Ind. Code § 32-36-1-10.

The legislature has codified several key exceptions to this statute, two of which were argued before our Court. The "newsworthy value" exception provides that the right of publicity does not apply to "[t]he use of a personality's name, voice, signature, photograph, image, likeness, distinctive appearance, gestures, or mannerisms in … [m]aterial that has political or newsworthy value." Ind. Code. § 32-36-1-1(c)(1)(B). Another provision, the "public interest" exception, concerns the use of a personality's right of publicity "in connection with the broadcast or reporting of an event or a topic of general or public interest." Ind. Code § 32-36-1-1(c)(3). If the use of a personality's right of publicity falls into either of these categories, the statute does not apply and no consent is needed for its use.

Keeping in mind our narrow approach to answering the certified question, and because we find that the use of players' names, pictures, and statistics by fantasy sports operators falls into the "newsworthy value" exception, we decline to examine the "public interest" exception. We will, however, examine the contours of the "newsworthy value" exception to determine its scope.

## The "Newsworthy Value" Exception

We turn our focus now to whether the use of the players' names, pictures, and statistics fall within the newsworthy value exception. Because "newsworthy value" is not expressly defined in the statute, our primary goal is to determine and give effect to the intent of the legislature. *Moryl v. Ransone*, 4 N.E.3d 1133, 1137 (Ind. 2014). In doing so, we examine the statutory language itself to "give effect to the plain and ordinary meaning of statutory terms." *State v. Hancock*, 65 N.E.3d 585, 587 (Ind. 2016). We also presume that the legislature "intended the statutory language to be applied logically and consistently with the statute's underlying policy and goals." *Walczak v. Labor Works-Ft. Wayne LLC*, 983 N.E.2d 1146, 1154 (Ind. 2013).

We begin by addressing two arguments advanced by plaintiffs in this case.  First, we are not persuaded that the statutory exception for newsworthiness does not apply in the context of commercial use.  The statute itself does prohibit the use of a person's right of publicity "for a commercial purpose."  *See* Ind. Code § 32-36-1-8.  The newsworthy value exception, however, removes the material from the right of publicity's application.  Ind. Code § 32-36-1-1(c).  We therefore decline to read such a requirement into the otherwise facially clear language of the statute.

Second, whether Defendants are media companies or news broadcasters is immaterial in the context of the newsworthiness exception.  The plain language of the statute only speaks to the use of a personality's right of publicity in "[m]aterial that has political or newsworthy value."  Ind. Code § 32-36-1-1(c)(1)(B).  The statute is silent on whether there are any restrictions on who publishes or uses the material.  Conversely, there is a different exception that applies specifically to a "news reporting or an entertainment medium."  *See* Ind. Code § 32-36-1-1(c)(1)(D).  Given that the legislature defined[2] and carved out an exception that applies only to news reporting entities, we decline to place a similar restriction on the "newsworthy value" exception at issue here.  If this was not the intent of the legislature at the statute's inception, it is free to revisit and redraw the exceptions.

The scope of the "newsworthy value" exception becomes considerably less clear as we consider the parties' competing interests in this case.  The statute references "material that has political or newsworthy value," but provides no corresponding definitions or apparent clues as to the breadth of these ambiguously familiar terms.  Ultimately, however, we think there are several compelling reasons why our Court should understand the

---

[2] *See* Ind. Code § 32-36-1-4, which defines "news reporting or an entertainment medium" as "a medium that publishes, broadcasts, or disseminates advertising in the normal course of its business, including the following: (1) Newspapers. (2) Magazines. (3) Radio and television networks and stations. (4) Cable television systems."

term "newsworthy value" to incorporate fantasy sports operators' use of players' names, pictures, and statistics.

First, there is a presumption that when the legislature enacts a statute, it is aware of the common law and does not intend to make a change unless it expressly or unmistakably implies that the common law no longer controls. *Gunderson v. State, Indiana Dep't of Natural Res.*, 90 N.E.3d 1171, 1182 (Ind. 2018). Although no Indiana court has directly created a common law right of publicity in our state, we find the historical progression of this right to be particularly illuminating.

Prior to any discussion of a right of publicity, courts struggled with the inherent tension of applying the right of privacy in the context of commercial appropriation of a personality. *See O'Brien v. Pabst Sales Co.*, 124 F.2d 167, 170 (5th Cir. 1941), *reh'g denied* (declining to extend the right of privacy to an action by a TCU football player whose picture appeared in a calendar for Pabst Blue Ribbon beer because there were "no statements or representations made…which were or could be either false, erroneous or damaging to plaintiff"). A decade later, the idea of the right of publicity began to gain traction independent of the right of privacy when the Second Circuit announced this new right as it applied to "prominent persons." *See Haelan Laboratories, Inc. v. Topps Chewing Gum, Inc.*, 202 F.2d 866, 868 (2nd Cir. 1953). The court in *Haelan Laboratories* wrote:

> [I]n addition to and independent of that right of privacy (which in New York derives from statute), a man has a right in the publicity value of his photograph… For it is common knowledge that many prominent persons (especially actors and ball-players) …would feel sorely deprived if they no longer received money for authorizing advertisements, popularizing their countenances, displayed in newspapers, magazines, busses, trains, and subways.

*Id*. at 868. The right of publicity, however, would not gain the attention of the Supreme Court of the United States until 1977, when that Court recognized Ohio's statutory right of publicity as a distinctly separate right

from the right of privacy. *Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562, 573, 97 S.Ct. 2849, 2856, 53 L.Ed.2d 965 (1977).

The *Zacchini* decision involved a "human cannonball" act performed by Hugo Zacchini at an Ohio county fair. *Id*. at 563. Members of the public were charged a fee to enter the fair and watch the performance, but a reporter at the event videotaped the act and showed the routine in its entirety on the eleven o'clock news. *Id*. at 563-64. Zacchini sued, alleging "unlawful appropriation of [his] professional property." *Id*. at 564. The Court held that publishing the entire performance without Zacchini's consent violated his right of publicity, finding that the economic value of the performance gave Zacchini a right to control its publicity. *Id*. at 575-76. Important to our analysis today, however, the Court also noted, "It is evident…that petitioner's state-law right of publicity would not serve to prevent respondent from reporting the newsworthy facts about petitioner's act…[but] the First and Fourteenth Amendments do not immunize the media when they broadcast a performer's entire act without his consent." *Id*. at 574-75. Thus, it seems to us that the Supreme Court recognized that at least some "newsworthy facts" could be published outside the scope of a personality's right of publicity.

Closer to home in Indiana and prior to the statute's enactment in 1994, the term "newsworthy" was understood to encompass a broad privilege that was "defined in most liberal and far reaching terms." *Time, Inc. v. Sand Creek Partners, L.P.*, 825 F.Supp. 210, 212 (S.D. Ind. 1993) (quoting *Rogers v. Grimaldi*, 695 F.Supp. 112, 117 (S.D.N.Y. 1988)). More specifically:

> The privilege of enlightening the public is by no means limited to dissemination of news in the sense of current events but extends far beyond to include all types of factual, educational and historical data, or even entertainment and amusement, concerning interesting phases of human activity in general.

*Id*. Considering the genesis and evolution of the right of publicity, and presuming the General Assembly was aware of the right of publicity, its origins, and the definitions available from caselaw in this area, we find that the term "newsworthy" was meant to be construed broadly.

Another compelling reason for a broad construction of the term "newsworthy" is that we follow the "familiar canon of statutory interpretation that statutes should be interpreted so as to avoid constitutional issues." *City of Vincennes v. Emmons*, 841 N.E.2d 155, 162 (Ind. 2006) (citing *Gomez v. United States*, 490 U.S. 858, 864 (1989)). When considering a statute through the lens of the First Amendment, one component of our typical inquiry involves whether the statute is content neutral. *State v. Economic Freedom Fund*, 959 N.E.2d 794, 801 (Ind. 2011). As such, a broad interpretation of the term "newsworthy value" would likely avoid a First Amendment issue in parsing acceptable forms of speech. *See, e.g., Dillinger, LLC v. Electronic Arts Inc.*, 795 F.Supp.2d 829, 836 (S.D. Ind. 2011) (finding it likely that the Indiana Supreme Court would adopt a broad definition of "literary works" to include videogames to avoid constitutional issues with a narrow definition).

To bolster this point, the General Assembly has also built in exceptions for other types of material that had been given First Amendment consideration prior to the statute's enactment in 1994. *Compare Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 557, 95 S.Ct. 1239, 1246, 43 L.Ed.2d 448 (1975) (finding "theatrical works" protected by the First Amendment), *Jenkins v. Georgia*, 418 U.S. 153, 161, 94 S.Ct. 2750, 2755, 41 L.Ed.2d 642 (1974) (film), and *Ward v. Rock against Racism*, 491 U.S. 781, 790, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989) (music) *with* Ind. Code § 32-36-1-1(c)(1) (the right of publicity does not apply to theatrical works, musical compositions, or film). These enumerated exceptions, including "material with newsworthy value," represent an obvious attempt to avoid constitutional issues with the statute. Against this backdrop, we find no indication within the text of the statute that the legislature intended to abrogate the expansive common law view of the term "newsworthy."

Considering the arguments presented in this case, Defendants' use of players' names, images, and statistics in conducting fantasy sports competitions bears resemblance to the publication of the same information in newspapers and websites across the nation. We agree that, "it would be strange law that a person would not have a first amendment right to use information that is available to everyone." *C.B.C. Distribution and Marketing, Inc. v. Major League Baseball*, 505 F.3d 818, 823 (8th Cir. 2007).

This information is not stripped of its newsworthy value simply because it is placed behind a paywall or used in the context of a fantasy sports game. On the contrary, fantasy sports operators use factual data combined with a significant, creative component that allows consumers to interact with the data in a unique way. Although fictional salary values are assigned to players, this does not change the function of the underlying data. It is difficult to find that the use of this otherwise publicly available information is somehow drastically different such that it should be placed outside the definition of "newsworthy."

## Use in Advertisements

We now confront whether Defendants' use of players' names, pictures, and statistics could constitute unauthorized advertising. At minimum, both parties would seem to agree that the statistics of college athletes are newsworthy. The public fascination with these facts and figures provides context and standards by which past, present, and future players are judged. *See generally C.B.C. Distrib.*, 505 F.3d at 823 (discussing how sports like baseball occupy a large portion of public discourse) and *CBS Interactive Inc. v. National Football League Players Ass'n*, 259 F.R.D. 398, 419 (D.Minn. 2009) (noting that, "[c]onsumers of fantasy football… like consumers of fantasy baseball, closely track player statistics"). This fascination extends to our own state where many fans of the Notre Dame Fighting Irish, Purdue Boilermakers, Indiana Hoosiers, and all other collegiate sports teams argue, debate, and commiserate over the statistical value of each player and where his or her achievements fall in the history of football or basketball. Few activities invoke such fervor among so many over so little.

At the other end of the newsworthy spectrum, we recognize that the unauthorized use of a personality to advertise or promote a product likely lies outside the scope of what is considered newsworthy. *See generally Abdul-Jabbar v. General Motors Corp.*, 85 F.3d 407, 416 (9th Cir. 1996) (holding that Kareem Abdul-Jabbar could state a claim under California's right of publicity when GMC gained a commercial advantage in using Abdul-Jabbar's former name in a television advertisement). The right to

control one's identity from direct appropriation would seem central to the right of publicity recognized in Indiana.[3] *Cf. Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 95 F.3d 959, 967-68 (10th Cir. 1996) (discussing how the right of publicity in Oklahoma involves property rights for the full commercial value of an identity).

In the context of fantasy sports, however, courts have recently concluded the risk of unauthorized advertising is minimal. *See C.B.C. Distrib.*, 505 F.3d at 824 (holding that the use of statistics and likenesses of baseball players in a fantasy sports context does not implicate a right of publicity in terms of advertising "because the fantasy baseball games depend on the inclusion of all players and thus cannot create a false impression that some particular player with 'star power' is endorsing CBC's products."); *CBS Interactive*, 259 F.R.D. at 419 (reasoning that "[n]o one seriously believes that the subjects of news reports are endorsing the company that provides the report"). We embrace this understanding and find that under similar circumstances—when informational and statistical data of college athletes is presented on a fantasy sports website—it would be difficult to draw the conclusion that the athletes are endorsing any particular product such that there has been a violation of the right of publicity. Importantly, however, this finding does not foreclose a court from closely scrutinizing the actions of a particular defendant to ensure no unauthorized endorsements are being made. At the risk of overstepping the bounds of the certified question, we defer making any factual determination on this issue to our federal colleagues.

## Conclusion

We conclude that Indiana's right of publicity statute contains an exception for material with newsworthy value that includes online fantasy

---

[3] The statute reportedly came about after concerns that profiteers were selling baseball-style cards of an AIDS victim without the consent of his surviving family. Dan Wetzel, *Law ends pirating of celebrities*, INDIANAPOLIS STAR, June 25, 1994, at B1.

sports operators' use of college players' names, pictures, and statistics for online fantasy contests.

Rush, C.J., and Massa, Slaughter, and Goff, JJ., concur.

ATTORNEYS FOR APPELLANT
Stephen B. Caplin
Stephen B. Caplin Professional Corporation
Indianapolis, Indiana

W. Clifton Holmes
The Holmes Law Group, Ltd.
Chicago, Illinois

Todd L. McLawhorn
Siprut PC
Chicago, Illinois

ATTORNEYS FOR APPELLEE
Ian H. Gershengorn
Kenneth L. Doroshow
Ishan K. Bhabha
Jenner & Block LLP
Washington, District of Columbia

John R. Maley
Peter J. Rusthoven
Barnes & Thornburg
Indianapolis, Indiana

Damien J. Marshall
Boies Schiller Flexner
New York, New York

ATTORNEY FOR AMICUS CURIAE
CMG WORLDWIDE
Theodore J. Minch
Sovich Minch, LLP

Indianapolis, Indiana

ATTORNEY FOR AMICI CURIAE
INTELLECTUAL PROPERTY LAW PROFESSORS
John A. Conway
LaDue Curran & Kuehn LLC
South Bend, Indiana

ATTORNEYS FOR AMICUS CURIAE
FANTASY SPORTS TRADE ASSOCIATION
Rudolph A. Telscher, Jr.
Kara R. Fussner
Husch Blackwell LLP
St. Louis, Missouri

John W. Borkowski
Husch Blackwell LLP
South Bend, Indiana

ATTORNEYS FOR AMICI CURIAE
MAJOR LEAGUE BASEBALL PLAYERS ASS'N, ET AL.
Michael Rubin
P. Casey Pitts
Altshuler Berzon LLP
San Francisco, California

Gabriel A. Hawkins
Lynn Toops
Cohen & Malad, LLP
Indianapolis, Indiana

ATTORNEY FOR AMICUS CURIAE
NEW SPORTS ECONOMY INSTITUTE
Libby Yin Goodknight
Krieg DeVault LLP
Indianapolis, Indiana