UNITED STATES of America, Appellee,

v.

Howard K. COHEN, Appellant.

UNITED STATES of America, Appellee,

v.

Angelo M. GIUDICE, Appellant.

Nos. 77–1831, 77–1853.

United States Court of Appeals,
Eighth Circuit.

Submitted Feb. 13, 1978.

Decided Sept. 12, 1978.

Roger Jon Diamond of Hecht, Diamond & Greenfield, Pacific Palisades, Cal., for appellants.

Robert L. Sikma, Asst. U. S. Atty., Sioux City, Iowa, for appellee; James H. Reynolds, U. S. Atty., Cedar Rapids, Iowa, on the brief.

Before HEANEY and STEPHENSON, Circuit Judges, and BECKER, Senior District Judge.*

WILLIAM H. BECKER, Senior District Judge.

These are consolidated appeals by Howard K. Cohen (Cohen) and Angelo M. Giud-

---

* The Honorable William H. Becker, Senior United States District Judge, Western District of Missouri, sitting by designation.

ice (Giudice). Each appeal from the judgment of conviction following a joint trial by jury in the United States District Court for the Northern District of Iowa.

Cohen and Giudice were individually and jointly charged in a single indictment containing 14 separate counts charging violations of Sections 2, 371, 1461, and 1462, Title 18, United States Code.[1] All statutory references hereinafter are to sections of Title 18, United States Code. The separate counts, the statutes on which each is based, and the jury verdict on each count are presented below in tabular form.

| Count Number | Gist of Count | Sections on Which Count is based | Verdicts of Jury |
|---|---|---|---|
| 1 | Conspiracy | § 371 | Cohen—Guilty Giudice—Guilty |
| 2 | Substantive Offense | §§ 2; 1461 | Cohen—Guilty Giudice—Guilty |
| 3 | " | §§ 2; 1461 | Cohen—Guilty Giudice—Guilty |
| 4 | " | §§ 2; 1461 | Cohen—Guilty Giudice—Guilty |
| 5 | " | §§ 2; 1461 | Cohen—Guilty Giudice—Guilty |
| 6 | " | §§ 2; 1461 | Cohen—Guilty Giudice—Guilty |
| 7 | " | §§ 2; 1461 | Cohen—Guilty Giudice—Guilty |
| 8 | " | §§ 2; 1461 | Cohen—Not Guilty Giudice—Guilty |
| 9 | " | §§ 2; 1461 | Cohen—Not Guilty Giudice—Guilty |
| 10 | " | §§ 2; 1461 | Cohen—Not Guilty Giudice—Guilty |

1. 18 U.S.C. § 2 provides that:

"(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

"(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."

18 U.S.C. § 371 provides, in pertinent part, that:

"If two or more persons conspire . . . to commit any offense against the United States . . . and one or more of such persons do any act to effect the object of the conspiracy . . ." each is guilty of an offense against the United States.

18 U.S.C. § 1461 provides, in pertinent part, that:

"Every obscene, lewd, lascivious, indecent, filthy or vile article, matter, thing, device, or substance

. . . . .

"Every written or printed card, letter, circular, book, pamphlet, advertisement, or notice of any kind giving information, directly or indirectly, where, or how, or from whom, or by what means any of such mentioned matters, articles, or things may be obtained or made

. . .

"Is declared to be nonmailable matter and shall not be conveyed in the mails or delivered from any post office or by any letter carrier.

"Whoever knowingly uses the mails for the mailing, carriage in the mails, or delivery of anything declared by this section to be nonmailable, or knowingly causes to be delivered by mail according to the direction thereon . . ." shall be guilty of an offense against the laws of the United States.

18 U.S.C. § 1462 provides, in pertinent part, that:

"Whoever . . . knowingly uses any express company or other common carrier, for carriage in interstate . . . commerce—

(a) any obscene, lewd, lascivious or filthy . . . pamphlet, picture, motion-picture film, paper, letter, writing, print, or other matter of indecent character . . ." shall be guilty of an offense against the laws of the United States.

| Count Number | Gist of Count | Sections on Which Count is based | Verdicts of Jury |
|---|---|---|---|
| 11 | " | §§ 2; 1461 | Cohen—Not Guilty<br>Giudice—Guilty |
| 12 | " | §§ 2; 1461 | Cohen—Not Guilty<br>Giudice—Guilty |
| 13 | " | §§ 2; 1461 | Cohen—Not Guilty<br>Giudice—Guilty |
| 14 | " | §§ 2; 1462 | Cohen—Not Guilty<br>Giudice—Guilty |

Count I, charging criminal conspiracy to violate Sections 1461 and 1462, alleges the commission of 16 overt acts in furtherance thereof, all in violation of § 371.

Based on the verdicts of the jury, described above, Giudice was fined $250 on each of counts 1–14, and placed on probation for four years. Cohen was fined $500 on each of counts 1–7, and placed on probation for three years. We affirm each of the judgments of conviction.

## Prior History

On July 11, 1974, the Grand Jury in the Northern District of Iowa returned a 14-count indictment against appellants Cohen and Giudice and four other defendants, Robert Elkins, Stephen R. Ginsburg, Daniel Goldblum (also known as Danny Gold), and Richard J. Aronson, charging violations of § 1461 and § 1462. The indictment alleged the mailing, and using common carriers for the carriage in interstate commerce, from California to Iowa, of obscene materials, and advertisements informing how obscene materials might be obtained. All defendants moved for a change of venue from the Northern District of Iowa to the Central District of California for the convenience of parties and witnesses pursuant to Rule 21(b) F.R.Cr.P. The United States opposed the motion of the defendants for change of venue, but the District Court of the Northern District of Iowa granted the motion. *United States of America v. Robert Elkins, et al.,* No. CR 74–4015 (N.D.Ia. December 6, 1974). The change of venue was granted on the ground that, while *Miller v. Califor-* nia, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973) requires the contemporary community standards of the Northern District of Iowa (the area of distribution of the material) regarding obscenity should be applied, under *Hamling v. United States,* 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974), opinion evidence may be received in the Central District of California of the contemporary community standards of the affected areas of Iowa.

In the Central District of California, a pretrial evidentiary ruling was made by the District Court that only the contemporary community standards of the Northern District of Iowa would be applicable at trial, and that these community standards could not be proven solely by means of expert opinion testimony, because expert testimony is admissible only to assist a jury in using its knowledge of contemporary community standards to determine the question of obscenity. For this reason, on its initiative the District Court for the Central District of California dismissed the indictment, without prejudice, stating:

> The Court concludes that a jury selected from the residents of this District could not determine the contemporary community standards of the Northern District of Iowa by reason of its members not possessing the knowledge of a juror in Iowa of the community standards in which the Iowa juror resides, necessary in deciding what conclusion the average person, applying the contemporary community standards of Iowa, would reach based on the facts adduced in the instant case.

**1034**

*United States v. Elkins,* (C.D.Cal.1975) 396 F.Supp. 314, l.c. 318.

Thereafter Cohen, Giudice, Elkins, Ginsburg and Goldblum were again indicted in the Northern District of Iowa on June 19, 1975, on essentially the same charges as in the first indictment dismissed in the Central District of California. In the second indictment, Aronson, a defendant in the first indictment, was named as an unindicted co-conspirator (R. 1). The defendants again moved for a change of venue from the Northern District of Iowa, which was also opposed by the United States, but the District Court again granted the motion of defendants to change the venue to the Central District of California, *United States of America v. Robert Elkins, et al.,* No. CR 75–4022 (N.D.Ia. October 1, 1975).

The United States petitioned this Court for a writ of mandamus, challenging the validity of the second order changing the venue of the second indictment to the Central District of California. The petition for writ of mandamus was granted by this Court because ". . . under the circumstances of this case and in view of the recent decisions of the Supreme Court that obscenity *vel non* must be determined on a local community standard, we have no choice but to order that this case be tried in Iowa." *United States v. McManus,* (C.A. 8 1976) 535 F.2d 460, l.c. 464, *cert. denied, McManus v. United States,* 429 U.S. 1052, 97 S.Ct. 766, 50 L.Ed.2d 769 (1977).

On August 15, 1977, immediately prior to trial, defendants Elkins and Ginsburg pleaded guilty to Count 2 of the indictment (R. 78, 79). The United States dismissed the indictment against Goldblum in return for a guilty plea in an unrelated case in the Central District of California (Transcript, hereinafter "T". 195). The criminal action proceeded to trial against the two remaining defendants, Cohen and Giudice, on August 15, 1977 (T. 1).

*Particulars of the Second Indictment*

Count I of the second indictment (indictment hereinafter) charged that from on or about June 1, 1973, until the date of the indictment, June 19, 1975, appellants Cohen and Giudice together with Elkins, Ginsburg, and Goldblum, all doing business as Hollywood Ltd., Metropolitan Mercantile, and Precision Fittings, wilfully and knowingly did conspire with each other and with Aronson, the unindicted co-conspirator, to cause to be delivered by mail, certain nonmailable matter, that is, obscene, lewd, lascivious, indecent, filthy, and vile advertisements and motion-picture films, in violation of § 1461; to cause to be delivered by mail, certain nonmailable matter, that is, advertisements giving information where, how, from whom, and by what means obscene, lewd, lascivious, indecent, filthy, and vile motion-picture films might be obtained, in violation of § 1461; and to use and cause to be used common carriers for carriage in interstate commerce, obscene, lewd, lascivious, and filthy advertisements and motion-picture films, in violation of § 1462.

Count 2 charged the mailing, on or about July 23, 1973, to Henry Gerdis, Woden, Iowa, in the Central Division of the Northern District of Iowa, of an advertisement, which was itself obscene.

Count 3 charged the mailing, on or about July 23, 1973, to Henry Gerdis, of an advertisement giving information by which two obscene films ("Deep Throat No. 2" and "John Holmes No. 9") might be obtained.

Count 4 charged the mailing, on or about August 1, 1973, to Elmer J. Duistermars, Sioux Center, Iowa, in the Western Division of the Northern District of Iowa, of an advertisement giving information by which two obscene films ("Deep Throat No. 2" and "John Holmes No. 9") might be obtained.

Count 5 charged the mailing, on or about August 1, 1973, to Elmer J. Duistermars, of an advertisement which was itself obscene.

Count 6 charged the mailing, on or about August 8, 1973, to said Duistermars, of an advertisement which was itself obscene.

Count 7 charged the mailing, on or about August 8, 1973, to said Duistermars, of an advertisement giving information by which two obscene films ("Deep Throat No. 2" and "John Holmes No. 9") might be obtained.

Count 8 charged the mailing on or about September 15, 1973, to A. Madsen, at an address in Sioux City, Iowa, in the Western Division of the Northern District of Iowa, of an advertisement which was itself obscene.

Count 9 charged the mailing, on or about September 15, 1973, to A. Madsen, of an advertisement giving information by which two obscene films ("Deep Throat No. 2" and "John Holmes No. 9") might be obtained.

Count 10 charged the mailing, on or about October 1, 1973, to "Clifford Anders" (a fictitious name used by Postal Inspectors), at an address in Sioux City, Iowa, in the Western Division of the Northern District of Iowa, of an obscene motion-picture film ("Linda No. 2"), and an advertisement which was itself obscene.

Count 11 charged the mailing, on or about October 1, 1973, to said "Anders", of an advertisement giving information by which two obscene films ("Deep Throat No. 2" and "John Holmes No. 9") might be obtained.

Count 12 charged the mailing, on or about October 17, 1973, to said "Anders", of an advertisement which was itself obscene.

Count 13 charged the mailing, on or about October 17, 1973, to said "Anders", of an advertisement giving information by which two obscene films ("Deep Throat No. 2" and "John Holmes No. 9") might be obtained.

Count 14 charged the use of a common carrier on or about November 16, 1973, for carriage in interstate commerce to "James Friend" (a fictitious name used by Postal Inspectors), at an address in Moville, Iowa, in the Western Division of the Northern District of Iowa, of an obscene motion picture film ("PM–17"), and an advertisement, which was itself obscene.

The jury returned its verdicts, described above, on August 18, 1977 (R. 66).

Appellant Cohen filed post-trial motions for an order setting aside the guilty verdict and entering judgment of acquittal, or alternatively, for a new trial, on August 25, 1977 (R. 67), which were denied by order dated September 23, 1977 (R. 73). Appellant Giudice did not file any post-trial motions. Appellants Giudice and Cohen each filed timely notices of appeal on October 17, and October 18, 1977, respectively (R. 82, 86).

*Summary of Facts and Material Evidence*

It is firmly established that on appeal of a criminal conviction based on a jury verdict, this Court must consider the evidence in the light most favorable to the appellee. *Glasser v. United States,* 315 U.S. 60, l.c. 80, 62 S.Ct. 457, l.c. 469, 86 L.Ed. 680, l.c. 704 (1942); *United States v. Carlson,* (C.A. 8 1976) 547 F.2d 1346, l.c. 1351, *cert. denied, Carlson v. United States,* 431 U.S. 914, 97 S.Ct. 2174, 53 L.Ed.2d 224 (1977). Further, all reasonable inferences from the evidence which tend to support the verdicts of the jury are considered to be proven. *United States v. Overshon,* (C.A. 8 1974) 494 F.2d 894, *cert. denied, Overshon v. United States,* 419 U.S. 853, 95 S.Ct. 96, 42 L.Ed.2d 85 (1974). Under these standards the proven facts are summarized as follows:

Giudice had been in the insurance business for several years in California when, in October 1971, he and Ginsburg formed an organization to do insurance business, called Commercial and Professional Services (hereinafter CAPS) (T. 107, 345). The office of CAPS was located at 1059 Ventura Boulevard, Suite 912, Encino, California (T. 89–90, 156).

In late 1971 or early 1972, Goldblum was hired by CAPS to work as an insurance agent. Later, however, there was a discussion in the office of CAPS "about looking to go into some investment, different business. The film business was mentioned" (T. 158).

In early 1973, Goldblum stated to Giudice and Ginsburg that he was a friend of Elkins, who was looking for an investor in the film business in which Elkins was engaged. When asked about the gist of the conversation with Goldblum, Giudice testified that:

Mr. Elkins had an investment package. He apparently—He was a distributor of x-rated movie films throughout the Unit-

ed States and he supplied movie theaters and small towns all over the United States and book stores with these x-rated films and they were looking for an investor to invest in a new line of film that Mr. Elkins was producing, or something. I don't know whether he produced them or was going to produce them. I don't remember now (T. 347).

A meeting was arranged between Giudice, Elkins, Ginsburg, and Goldblum in the office of CAPS (T. 158). The date of this meeting does not appear in the record (Appellants' Br. 10). As a result, Giudice invested $20,000 in return for the right to distribute Elkins' pornographic and mail order films (Appellants' Br. 10; T. 159–60, 348–49).

The $20,000 invested by Giudice was to be used for expenses such as advertising brochures, envelopes, and postage. Elkins had purchased mailing lists of names and addresses of persons to whom the advertisements would be sent (T. 159–60). Brochures, envelopes, and postage were sent to the office of CAPS, where the preparation and mailing of the brochures were to be accomplished (T. 162, 353–54).

Aronson began working in the office of CAPS in June 1973. Originally Aronson was hired to secure by telephone prospective clients for the insurance business, but later he was asked to do various tasks relating to the mail order business of CAPS, including the preparation for, and mailing of brochures advertising sex films (T. 220–21).

Ginsburg secured a post office box in Hollywood. Mr. William Hellman, manager of Alsop Telephone and Answering Service (Alsop), 5466 Santa Monica Boulevard, Los Angeles, California, testified that Alsop leased a mail box for postal delivery to "Hollywood Limited" on June 14, 1973 (T. 253–54).

A machine which automatically stuffed and sealed envelopes, at the rate of several hundred per hour, was delivered to the office of CAPS, addressed to "Movieland Distributors". Giudice signed the acceptance form for this machine, signing the name "Bob Elkins" (T. 353–54). Mr. Murray Keatinge, President of Pacific Mailing Equipment Corporation (Pacific), Los Angeles, testified that his company leased a machine which inserts brochures into envelopes, and then seals and stamps the envelope, to Movieland Distributors, 1059 Ventura Boulevard, Encino, California (T. 85). The machine was rented for a six-month period, July 20, 1973 to January 20, 1974 (T. 86).

Mr. Harold Warren testified that he was a service technician for Pacific and, as such, made two service calls to the office of CAPS to repair the machine that CAPS had leased (T. 89). Warren noticed that the machine was being used to insert pornographic brochures into envelopes (T. 93). Warren was introduced to a "Bob Elkins" at the office of CAPS, who signed that name to the service order, but one of the other persons in the room called that person "Angelo", the first name of Giudice (T. 95).

Cohen met Elkins approximately two months before June 1973 (T. 403), and began to work out of Elkins' office in early 1973, trying to sell "x-rated movies" on video cassettes for Elkins (T. 385, 404). Cohen testified that he also was trying to sell an electric pipe which he had invented and hoped to market (T. 378, 381, 385). Cohen had 15,000 brochures, advertising the pipe, printed.

Elkins introduced Cohen to Giudice, Goldblum, and Ginsburg of CAPS, and suggested that Cohen might be able to place his pipe brochures within the envelopes that CAPS was mailing (T. 386). An agreement was reached by which Cohen would be allowed to insert his pipe brochures himself, within the envelope mailing the pornographic material, at the office of CAPS. In exchange, Cohen agreed to have his office on West Peco Boulevard be used as a "mail drop" for return mail containing orders of customers for the pornographic material (T. 163–65, 388, 410–12). Cohen had signed a lease of the premises at 8879 West Peco Boulevard, Suite 1, Los Angeles, California beginning July 19, 1973 (T. 108–09, 113).

Cohen testified that the office on West Peco Boulevard was partitioned and that he "subrented" the "outer" portion to Metropolitan Mercantile, Hollywood Limited, and Precision Fittings, which were the company names used for return addresses for customers ordering pipes and pornographic films, or either of them (T. 170, 391). The door to this "outer" portion of Suite 1 contained a mail slot through which the mail containing orders and payments was deposited (T. 391).

Cohen later thought that CAPS owed him money, so he began to open the mail and take out money orders and checks sent to pay for pornographic material (T. 393). Cohen would have his father deposit the out-of-state checks in an account of MG Sales Company, which his father owned, and his father would then write Cohen a check for that amount (T. 393–94).

A dispute arose between CAPS and Cohen because customers complained that they never received the films that were ordered although their checks were cashed. At about the same time Cohen noticed that mail was being returned to the sender, Metropolitan Mercantile, at the address of Cohen on West Peco Boulevard, marked "obscene". Cohen stated he telephoned the office of CAPS and told them he no longer wanted return mail delivered to his office on West Peco Boulevard. Cohen then went to the post office in Los Angeles and accomplished a change of address to "another address that these gentlemen at CAPS said they wanted their mail to go to" (T. 399). The change of address card was dated August 21, 1973 (Defendants' Exhibit "U", T. 399). Cohen stated that these events took place in August 1973, and that he was in the office on West Peco Boulevard from approximately July 19, 1973, until the end of August 1973 (T. 395–96).

In October 1973, Ginsburg, using the name "Richard Meyers", opened a bank account in the Bank of Tokyo of California, in the name of Precision Fittings, d/b/a Hollywood Limited and Metropolitan Mercantile (T. 232–33, 241, 245–46). Mr. Arthur Gianetti, assistant cashier of the Bank of Tokyo of California, identified several exhibits which were instruments deposited to that account, including a money order in the amount of $30.00 from Clifford Anders, Sioux City, Iowa (T. 250).

The machine which stuffed the pornographic brochures into envelopes was operated at various times by Ginsburg, Giudice, Aronson and Goldblum (T. 168). Cohen came and worked at the office of CAPS on several occasions (T. 169). On these occasions, the pornographic brochures advertising the sex films were open and lying around the office of CAPS (T. 169). Cohen sometimes physically deposited the outgoing mail containing both brochures into a mail chute for delivery to the addressees (T. 172).

After the return mail containing orders and payments for the films was picked up at the various "mail drops", including from the office of Cohen at 8879 West Peco Boulevard, it was brought to the office of CAPS (T. 163–64, 223–24, 230–31). The money in payment for the order of films, except that appropriated by Cohen, was given to either Giudice or Ginsburg (T. 166–67).

Goldblum and Aronson filled the orders that came in for the films. The film would be placed in an envelope, addressed for delivery to the customer, and then taken to United Parcel Service for shipment (T. 173).

Later on, a rift between Giudice and Ginsburg occurred in the office of CAPS. Thereafter, as time passed, Ginsburg made only token appearances at the office of CAPS, but Giudice was at the office most of the time, devoting the majority of his time to the film business (T. 165–67). Giudice "took charge" of CAPS, giving instructions to Aronson to file changes of address at various times for delivery of return mail containing orders and payments under fictitious names (T. 227–29).

Eventually, however, Ginsburg and Giudice ceased business operations together, and Giudice left the office of CAPS on October 15, 1973 (T. 361).

*Issues on Appeal*

According to the brief of appellants, the issues on appeal (discussed seriatim, below) are whether:

(A) The case should have been governed by pre-*Miller* standards;

(B) Evidence of California community standards was required;

(C) Evidence of scienter was established;

(D) The jury should have been instructed to apply 1973 standard;

(E) The case should have been tried in California;

(F) Counts 2, 3, 8, and 9 should be reversed because the recipients did not testify to receipt of mail described in those counts, and proof of receipt thereof was based on hearsay;

(G) Counts 2 and 3 should be reversed because jurors outside of the Western Division and from the Central Division of the Northern District of Iowa were improperly excluded;

(H) The Court erred in permitting a compound question by the prosecutor;

(I) Appellants were improperly denied additional peremptory challenges;

(J) Appellant Giudice was denied effective assistance of counsel;

(K) There was insufficient evidence to convict Cohen;

(L) The materials are not obscene;

(M) The Court erred in refusing to instruct that entertainment is protected by the First Amendment;

(N) The jury should have been instructed to consider the entire Northern District of Iowa.

Additionally, in connection with (A) above, counsel for appellants, for the first time in oral argument before this Court, contended that the *Miller* decision, *supra*, dated June 21, 1973, arguably did not become effective until October 9, 1973, when petition for rehearing was denied by the Supreme Court. Counsel for appellants cite no authority for this contention. Because the latter question was neither presented to the district court nor in appellants' brief, it is not preserved for our review on appeal.

Therefore we do not consider that question. Cf. *Wilson v. United States*, (C.A. 8 1977) 554 F.2d 893, l.c. 894, *cert. denied*, 434 U.S. 849, 98 S.Ct. 158, 54 L.Ed.2d 117 (1977).

**(A) Rulings on Applicable Standards**

■ Appellants first contend that the trial court erred in instructing the jury under the standards announced in *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (June 21, 1973), *reh. denied*, 414 U.S. 881, 94 S.Ct. 26, 38 L.Ed.2d 128 (October 9, 1973). Appellants contend that the case should have been governed by the standards previously announced in *Memoirs v. Massachusetts*, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966). The plurality in *Memoirs* held that if material is found to be obscene and therefore outside the protection of the First Amendment it:

. . . must be established that (a) the dominant theme of the material taken as a whole appeals to a prurient interest in sex; (b) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and (c) the material is utterly without redeeming social value.

383 U.S. l.c. 418, 86 S.Ct. l.c. 977, 16 L.Ed.2d l.c. 6.

In *Miller*, new standards were announced for isolating ". . . 'hard core' pornography from expression protected by the First Amendment," 413 U.S. l.c. 29, 93 S.Ct. l.c. 2617, 37 L.Ed.2d l.c. 434, in the following language:

The basic guidelines for the trier of fact must be: (a) whether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest . . .; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined . . .; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

413 U.S. l.c. 24, 93 S.Ct. l.c. 2615, 37 L.Ed.2d l.c. 431.

In support of their contention that pre-*Miller* standards should apply, appellants rely on *Marks v. United States*, 430 U.S. 188, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977). The issue in the *Marks* case was whether the standards announced in the *Miller* case, decided June 21, 1973, were to be retroactively applied, since the ". . . conduct that gave rise to the charges covered a period through February 27, 1973." 430 U.S. l.c. 189, 97 S.Ct. l.c. 991, 51 L.Ed.2d l.c. 263. The Supreme Court reversed the convictions of petitioners, holding that:

. . . the Due Process Clause precludes the application to petitioners of the standards announced in *Miller v. California*, to the extent that those standards may impose criminal liability for conduct not punishable under *Memoirs*. Specifically, since the petitioners were indicted for conduct occurring prior to our decision in *Miller*, they are entitled to jury instructions requiring the jury to acquit unless it finds that the materials involved are 'utterly without redeeming social value.' 430 U.S. l.c. 196, 97 S.Ct. l.c. 995, 51 L.Ed.2d l.c. 268 (Footnote omitted).

It is readily apparent that the *Marks* decision is not controlling in the instant case. In *Marks* the petitioners were brought to trial after the decision was rendered in *Miller*, but for conduct all occurring before the date of the *Miller* decision. In this action appellants were tried for conduct occurring before and after the decision in *Miller*. Significantly, of the 16 overt acts alleged to have occurred between June 1, 1973, and November 23, 1973, in the Count 1 conspiracy charge, only four occurred prior to June 21, 1973, and none of these were separately charged as a substantive violation. However, the remaining overt acts, and *all* of the acts which were charged as substantive violations, occurred after that date.

The verdicts on the substantive Counts 2 to 14 inclusive, demonstrate the bases of the verdict on Count 1, the conspiracy count. Each of the acts separately charged as a separate substantive count in the indictment is also specified as an overt act committed (on about the same date) in furtherance of the Count 1 conspiracy charge, as shown in the following tabulation:

| Count 1 Overt Act Number; and Dates, on or about: | Separate Substantive Count Number; and Dates, on or about: |
|---|---|
| 7; July 26, 1973 | 2; July 23, 1973 |
| 7; July 26, 1973 | 3; July 23, 1973 |
| 9; August 1, 1973 | 4; August 1, 1973 |
| 9; August 1, 1973 | 5; August 1, 1973 |
| 10; August 11, 1973 | 6; August 8, 1973 |
| 10; August 11, 1973 | 7; August 8, 1973 |
| 12; September 18, 1973 | 8; September 15, 1973 |
| 12; September 18, 1973 | 9; September 15, 1973 |
| 14; October 10, 1973 | 10; October 1, 1973 |
| 14; October 10, 1973 | 11; October 1, 1973 |
| 15; October 23, 1973 | 12; October 17, 1973 |
| 15; October 23, 1973 | 13; October 17, 1973 |
| 16; November 23, 1973 | 14; November 16, 1973 |

This tabulation affirmatively demonstrates, in respect to both Cohen and Giudice, that the jury specifically made findings that appellants committed overt acts in furtherance of the conspiracy after June 21, 1973, thus rendering the *Marks* case distinguishable from the facts in the case at bar, and thus inapposite.

Appellants correctly argue in this action, that in order to convict on the conspiracy charge that the jury must find (1) an agreement, (2) a combination of two or more persons, (3) an unlawful purpose, and (4) that at least one of the conspirators committed an overt act in furtherance of the conspiracy. *United States v. Brown*, (C.A. 8 1977) 547 F.2d 438, l.c. 442, *cert. denied*, 430 U.S. 937, 97 S.Ct. 1566, 51 L.Ed.2d 784 (1977). *United States v. Sellaro*, (C.A. 8 1973) 514 F.2d 114, l.c. 121, *cert. denied*, 421 U.S. 1013, 95 S.Ct. 2419, 44 L.Ed.2d 681 (1975). See also 1 *Wharton's Criminal Law and Procedure*, § 82 (1957) and Supplement thereto issued in January 1978, p. 46 *et seq.* However, appellants erroneously contend that because the first, or any, overt act was alleged to have been committed prior to the decision in *Miller*, that the conspiracy was "complete", and that appellants could not thereafter be convicted of conspiracy, even though committing several overt acts in furtherance of that conspiracy after the decision in *Miller*. The logical extension of this faulty reasoning is that appellants could have continued this scheme indefinite-

ly and never be convicted of conspiracy. Such is not the law.

A similar argument was made in *United States v. Perlstein*, (C.A. 3 1942) 126 F.2d 789, *cert. denied*, 316 U.S. 678, 62 S.Ct. 1106, 86 L.Ed. 1752 (1942). In the *Perlstein* case, appellants had been convicted of conspiracy to obstruct justice by endeavoring to influence, intimidate, and impede witnesses appearing before the grand jury. The indictment alleged seven overt acts. The Court of Appeals rejected the same argument made by appellants in this case that they could not be convicted of the conspiracy count, stating:

> The appellants contend also that the crime was completed before the inception of any federal proceedings because the first two overt acts alleged in the indictment took place before the commencement of the proceedings before the United States commissioners and the grand jury. It is true that the conspiracy was 'complete' with the commission of the first overt act in the sense that that word is ordinarily used in respect to a conspiracy, but the conspiracy had not come to an end. Other overt acts are alleged and were proved to have occurred after the commencement of the proceedings just referred to. The jury was entitled to draw the conclusion that it was the intention of the conspirators that the conspiracy should continue in existence . . . .

126 F.2d l.c. 798.

A conspiracy, once established, is presumed to continue until the contrary is established. *Marino v. United States*, (C.A. 9 1937) 91 F.2d 691, l.c. 695, *cert. denied*, 302 U.S. 764, 58 S.Ct. 410, 82 L.Ed. 593 (1938). See also *United States v. Roselli*, (C.A. 9 1970) 432 F.2d 879, l.c. 898, *cert. denied*, 401 U.S. 924, 91 S.Ct. 883, 27 L.Ed.2d 828 (1971). In the case at bar, there was ample evidence from which the jury could reasonably conclude, as it did, that the conspiracy continued, and that Cohen and Giudice were actively involved, well after the date of the decision in *Miller*. The evidence of that fact is that the jury found both Cohen and Giudice guilty of substantive acts in furtherance of the conspiracy after the *Miller* decision. This conclusion is corroborated by the discriminatory findings of the jury that Cohen was "not guilty" of any of the substantive offenses which occurred after August 21, 1973, the date on which Cohen effected the change of address card, changing the return address from his office on West Peco Boulevard to another address. On the other hand, the jury found that Giudice remained involved in the continuing conspiracy, by convicting him of all the substantive counts alleged in the indictment.

Therefore, the trial court properly instructed the jury that this case was governed under the standards announced in the *Miller* decision.

■ In connection with the argument that the court applied improper standards of obscenity, appellants argue that the district court erroneously failed to receive in evidence, Exhibit "J", an exhibit from an earlier trial in the Northern District of Iowa.

Because the *Miller* standards were the proper standards governing this case, the trial court did not err in refusing to grant the offer of appellants to introduce as evidence of the proper community standard, a brochure, Defendants' Exhibit "J", which was an exhibit introduced in a previous trial in the Northern District of Iowa, *United States v. Kaehler*, (N.D.Iowa 1973) 353 F.Supp. 476. Apparently the proffered Defendants' Exhibit "J" was the subject of Count 1 in the *Kaehler* case, of which defendant was not convicted. But the trial of defendant Kaehler was concluded on November 14, 1972, and the order denying defendant Kaehler's motion for a judgment of acquittal was filed on January 22, 1973. 353 F.Supp. l.c. 476. Therefore, the introduction of Defendants' Exhibit "J" was properly denied in the case at bar for several reasons. First, the effect of not convicting defendant Kaehler of Count 1 in his trial was not necessarily a declaration that the brochure itself was not obscene, but rather could have been grounded on a con-

clusion of failure to prove the guilt of defendant Kaehler beyond a reasonable doubt. Second, the *Kaehler* case was adjudged under the pre-*Miller* standards which we have already concluded do not apply to the case at bar. Finally, none of the elements of *res judicata,* estoppel by judgment, or principles of finality are present to support the offer.

**(B)** *The Applicable Community Standards*

■ Appellants concede that regarding the offenses of the mailing of obscene matter charged in Counts 2 through 14, the United States may prosecute in the Northern District of Iowa (Appellants' Br. 29). Appellants contend, however, regarding the Count 1 conspiracy count, that the United States should have been required to introduce evidence of the community standards of the Central District of California regarding obscenity, through expert witness testimony, because California is where the appellants formed the conspiracy and performed the overt acts in furtherance thereof.

The pertinent part of the applicable venue statute, § 3237 is:

"Offenses begun in one district and completed in another

(a) Except as otherwise expressly provided by enactment of Congress, any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed.

"Any offense involving the use of the mails, or transportation in interstate or foreign commerce, is a continuing offense and, except as otherwise expressly provided by enactment of Congress, may be inquired of and prosecuted in any district from, through, or into which such commerce or mail matter moves."

In *United States v. McManus, supra,* we ruled that only a local jury could determine the local community standards regarding obscenity. We further held that the Government has the option under § 1461

and § 1462 to prosecute this case in either the district in which the allegedly obscene material was mailed or in the district where it was received:

In the instant case, there is ample legislative history indicating Congress' concern to allow the district to which allegedly obscene matter is mailed (the recipient district) to institute the prosecution and to judge the character of the material under local standards. Congress specifically amended the postal obscenity statute in 1958 to permit the recipient district as well as the sending district to file the charges, since earlier decisions had held that venue existed only in the sending district.

. . . . .

In addition to the specific intent demonstrated by Congress to allow the recipient district to prosecute, we are faced with the fact that by its decisions in *Hamling* and *Miller,* the Supreme Court has determined that one of the constitutional standards used to determine obscenity is local rather than national in character.
*United States v. McManus, supra,* l.c. 463, 464.

The same principles apply to a charge of conspiracy to violate § 1461 and § 1462. In this case the applicable community standards are not those of the California district where the material was mailed, but rather those of the Northern District of Iowa to which the obscene materials were directed, in which they were delivered, and in which the United States prosecuted the case, as it was so authorized to do.

In this case, overt acts numbered 7, 9, 10, 12, 14, and 15 specifically charge that appellants " . . . caused to be *delivered* by mail . . ." to an address in the Northern District of Iowa, and overt act numbered 16 specifically charges that appellants " . . . caused to be *transported* by common carrier . . ." to an address in the Northern District of Iowa, the materials alleged to be obscene.

■ It is well settled that the offense of conspiracy may be tried not only in the

**1042**

district where the agreement was made, but also in the district where an overt act was committed. *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, l.c. 252, 60 S.Ct. 811, l.c. 858, 84 L.Ed. 1129, l.c. 1183 (1940), *reh. denied,* 310 U.S. 658, 60 S.Ct. 1091, 84 L.Ed. 1421; *United States v. Overshon, supra; United States v. Phillips,* (C.A. 8 1970) 433 F.2d 1364, *cert. denied,* 401 U.S. 917, 91 S.Ct. 900, 27 L.Ed.2d 819 (1971).

For these reasons, in this case the applicable community standards for all counts, including Count 1 the conspiracy count, are those of the Northern District of Iowa.

(C) *Question of Scienter of the Nature of the Films*

Appellants next contend that the Government did not establish that appellants "ever saw or were aware of the contents of the films" which were adjudged obscene by the jury verdicts (Appellants' Br. 30).

■ To prove the element of scienter, it is not necessary to show that appellants knew the materials were, in fact, obscene. Under § 1461, the inquiry "is whether the paper charged to have been obscene, lewd, and lascivious was in fact of that character, and if it was of that character and was deposited in the mail by one who knew or had notice at the time of its contents, the offence is complete . . . ." *Hamling v. United States,* 418 U.S. l.c. 120, 94 S.Ct. l.c. 2909, 41 L.Ed.2d l.c. 622, *quoting Rosen v. United States,* 161 U.S. 29, 16 S.Ct. 434, 40 L.Ed. 606 (1896).

■ In the case at bar, the jury was instructed that in order to convict appellants of mailing the obscene brochures and films, it must find that "for each of these counts, the defendants had knowledge of the contents or nature of the envelopes and packages at the time they were deposited for mailing and delivery" (Instruction No. 9, Tr. 447). There is ample direct and circumstantial evidence from which the jury could find that each of the appellants had knowledge of the nature and character of the obscene films.

Cohen had several meetings with Edwin Ellington, the printer of the obscene brochures which advertised and described the obscene films (T. 38–42). Also, Cohen admitted that he earlier had tried to sell pornographic video cassettes for Elkins, the producer of the pornographic films in evidence (T. 385–86). Giudice stated that when he invested $20,000 in Elkins' movie distribution business, he was aware that Elkins was a distributor of x-rated movie films throughout the United States (T. 347–49). There was evidence that Giudice directed the mailing of the obscene advertisements of the pornographic films (T. 226–27).

Further, the record on this appeal is replete with evidence that appellants attempted to conceal their personal involvement in the scheme by evasive tactics such as the use of various fictitious corporate names, many changes of address filed by persons using aliases, and the use of various locations as mail drops for return mail containing orders and payments from customers. From this the jury could infer that appellants knew that they were engaged in illegal activity.

Based on the evidence before it, the jury was entitled to conclude that appellants were well aware of the contents and nature of the obscene brochures and movie films. *Hamling v. United States,* 418 U.S. l.c. 124, 94 S.Ct. l.c. 2911, 41 L.Ed.2d 625.

(D) *The Time of the Applicable Community Standards*

■ Appellants next contend that the trial court erred in instructing the jury to consider the "contemporary community standards" regarding obscenity, without further specially instructing the jury to consider 1973 standards.

The jury was instructed that appellants "from approximately June 1, 1973, continuously until the time of the indictment" engaged in conspiracy to violate §§ 1461 and 1462, and that "from July 23, 1973, to October 17, 1973," appellants violated § 1461, and that "on or about November 16, 1973," appellants violated § 1462 (Instruction No.

5, Tr. 441–42). The jury was further instructed that:

Contemporary community standards are set by what is in fact accepted in the community as a whole. That is to say, by society at large or people in general; and not by what some persons or groups of persons may believe the community as a whole ought to accept or refuse to accept. It is a matter of common knowledge that customs change, and that the community as a whole may from time to time find acceptable that which was formerly unacceptable, and not infrequently may find presently acceptable that which some particular group of the population may regard as an unacceptable appeal to prurient interest (Instruction No. 16, Tr. 450).

The effect of these instructions is to require the jury to determine the issues under the community standards at the time of the offenses. The instructions, read as a whole and separately considered, adequately charge the jury on the time of the community standards to be applied.

It is noted also that appellants make no showing that there is any evidence that the contemporary community standards regarding obscenity that existed in 1977 were substantially different from, or more intolerate than those that existed in 1973. No error appears in the instructions in the respect contended by appellants.

(E) *Question of Trial in California*

It is next contended that appellants should have been tried in California. For the reasons discussed in Part (B) *supra,* it was proper that trial take place in the Northern District of Iowa. The prior decision of this Court cited above in prior history of this litigation has concluded this point adversely to appellants.

(F) *Sufficiency of Evidence on Counts 2, 3, 8, and 9*

■ Appellants' next contention is that there was insufficient foundation for the admission into evidence of two envelopes containing obscene advertisements num-

bered as Exhibits 2 (the subject of Counts 2 and 3) and Exhibit 8 (the subject of Counts 8 and 9). Appellants also objected to writings on the envelopes as inadmissible because of being hearsay. The trial court ruled the writing on Exhibit 2 to be inadmissible, and the writing on Exhibit 8 to be admissible. Otherwise, the exhibits were properly admitted. Appellants cite no authority for these contentions, nor do they demonstrate precisely how they were prejudiced thereby. *United States v. Dachsteiner,* (C.A. 9 1975) 518 F.2d 20, *cert. denied,* 421 U.S. 954, 95 S.Ct. 1688, 44 L.Ed.2d 107 (1975), in no way supports the assignment of error of appellants and affirmatively supports the appellee on several points.

It would serve no useful purpose to recount all the evidence regarding Counts 2, 3, 8 and 9. Our review of the record discloses ample testimonial and other identification evidence which establishes an unbroken chain of events by which the jury could infer that the envelopes in question were in fact received in the mail as alleged by the prosecution.

On the alleged inconsistency of the rulings on the admission of the writings on the exhibits, appellants have wholly failed to carry their burden to demonstrate prejudicial error. *See Durns v. United States,* (C.A. 8 1977) 562 F.2d 542, l.c. 548, *cert. denied,* 434 U.S. 959, 98 S.Ct. 490, 54 L.Ed.2d 319 (1977); *United States v. Bartlett,* (C.A. 8 1971) 449 F.2d 700, l.c. 706, *cert. denied,* 405 U.S. 932, 92 S.Ct. 990, 30 L.Ed.2d 808 (1972). We find against appellants on this issue.

(G) *Composition of the Jury*

■ Appellants next contend that the jury venire was improperly composed of only veniremen from the Western Division of the Northern District of Iowa, and that prospective jurors from other divisions were systematically excluded. Appellants argue that Counts 2 and 3 must be reversed because the recipient of the mailing in those counts lived in the Central Division of the Northern District of Iowa.

The jury was instructed that the contemporary community standards "are set by what is in fact accepted in the community as a whole. That is to say, by society at large or people in general . . . ." (Instruction No. 16, Tr. 450). The jury was not composed of persons outside of the Northern District of Iowa, nor was there an instruction limiting the jury to standards existing only in the Western Division of the Northern District of Iowa. The Supreme Court has stated that its holding in *Miller v. California, supra,* "did not mean that any such precise geographic area is required as a matter of constitutional law." *Hamling v. United States,* 418 U.S. l.c. 105, 94 S.Ct. l.c. 2901, 41 L.Ed.2d l.c. 613. Because the jurors in this case resided in the Northern District of Iowa, "they will draw upon their knowledge which may be representative of that area. Neither *Miller* nor *Hamling,* however, requires the trial court to define the relevant community in metes and bounds." *United States v. Dachsteiner, supra,* l.c. 22. While the *Dachsteiner* case involves the definition of the geographical community from which the applicable standards are ascertained, its ruling on the absence of a showing of prejudicial error is in point in this case. There is no evidence that different community standards exist in the Eastern and Western Divisions of the Northern District of Iowa, or that there was any unusual procedure employed in selection of the jury in this case.

(H) *Alleged Error in Permitting Compound Question*

■ Appellants next argue that the trial court improperly overruled appellants' objection to a question asked of Goldblum on direct examination. Goldblum, as a witness for the prosecution, was being questioned regarding the extent of Cohen's involvement in the actual physical mailing of the obscene brochures, which Goldblum had just identified. Quoting from the transcript:

Q. Can you tell me whether or not Mr. Cohen ever mailed or was required to mail any of the documents? [Here counsel for appellant objected, and was overruled].

A. He mailed sometimes.

Q. He did?

A. (Nodding in the affirmative.)

Q. Can you tell me any other items, other duties, as to physical work with regard to the mail order business that Mr. Cohen had, if any?

A. Well, outside of just stuffing the envelopes, that was the only physical—

Q. And mailing?

A. Yes. I just said—

(Tr. 172).

Taken in the context of the whole of the testimonial evidence of Goldblum, no significant vagueness or confusion is present in the answer. Finally, appellant was given full opportunity, through cross-examination of the witness, to clarify that particular point and resolve any alleged ambiguity in the answer of the witness. The form of the question was not prejudicial.

Appellant has not demonstrated any prejudicial error in this regard.

(I) *Denial of Additional Peremptory Challenges*

■ Appellants next contend that the trial court erred in overruling appellants' motion for additional peremptory challenges.

In a criminal trial when there is more than one defendant, Rule 24(b), F.R.Cr.P. provides that ". . . the court may allow the defendants additional peremptory challenges and permit them to be exercised separately or jointly." The use of the word "may" clearly permits, but does not require, the trial court, within its sound discretion, to allow additional peremptory challenges. *United States v. Cortwright,* (C.A. 7 1975) 528 F.2d 168, l.c. 175. Here, as in the *Cortwright* case, appellants have pointed to no fact which would make the denial of their requests for additional peremptory challenges an abuse of that discretion.

(J) *Effective Assistance of Counsel*

■ Giudice contends that he was denied the effective assistance of counsel and

that the trial court erred in refusing to grant a motion for continuance. A thorough review of the record does not support either contention. The test for effective assistance has been formulated in this circuit in the following language:

> The accepted standard for effectiveness of trial counsel is now established as that degree of performance which conforms to the care and skill of a reasonably competent lawyer rendering similar services under the existing circumstances. *United States v. Easter,* 539 F.2d 663, 666 (8th Cir. 1976), *cert. denied,* 434 U.S. 844, 98 S.Ct. 145, 54 L.Ed.2d 109 (1977). Furthermore, there is a presumption that counsel is competent, *Thomas v. Wyrick,* 535 F.2d 407, 413 (8th Cir.), *cert. denied,* 429 U.S. 868, 97 S.Ct. 178, 50 L.Ed.2d 148 (1976), and the petitioner must shoulder a heavy burden to override this presumption. *Id.; Crismon v. United States,* 510 F.2d 356, 358 (8th Cir. 1975); *McQueen v. Swenson (McQueen I),* 498 F.2d 207, 214 (8th Cir. 1974). *Reynolds v. Mabry,* (C.A. 8 1978) 574 F.2d 978, l.c. 979.

Appellant Giudice fails on this appeal to meet this heavy burden.

> . . . a motion for continuance is addressed to the sound discretion of the trial court, and a refusal to grant a continuance will be set aside only upon a showing of a clear abuse of discretion. *United States v. Jackson,* 549 F.2d 517, 528 (8th Cir.), *cert. denied,* 430 U.S. 985, 97 S.Ct. 1682, 52 L.Ed.2d 379 (1977); *United States v. Webb,* 533 F.2d 391, 395 (8th Cir. 1976). *United States v. Pelton,* 578 F.2d 701, 706 (C.A. 8, 1978).

The record indicates that Giudice was represented at all times throughout the proceedings by competent counsel of his own choosing. Trial counsel for Giudice filed his appearance on August 4, 1977, almost two weeks prior to the beginning of trial. The trial court allowed Giudice's previous counsel to withdraw only on condition that his withdrawal would not result in a continuance of the case, which because of interlocutory appeals, had been pending for over two years, and had been set for trial for at least one month. For all these reasons, we conclude that the trial court did not abuse its discretion in refusing to grant a continuance. We further conclude that the appellant Giudice has not shown ineffective assistance of counsel on the basis of this record.

**(K)** *Sufficiency of Evidence to Convict Appellant Cohen*

■ Appellant Cohen, having been convicted of Counts 1–7, contends the evidence is insufficient to support the convictions. This contention is plainly without merit.

There is substantial evidence in the record in this case to support the verdict of guilty returned against Cohen. Much of it has been recited above. It is amply sufficient to sustain the jury's determination of Cohen's guilt. It is enough that the evidence be "sufficient to convince the jury beyond a reasonable doubt that the defendant is guilty." *Durns v. United States, supra,* l.c. 546; *United States v. Shahane,* (C.A. 8 1975) 517 F.2d 1173, l.c. 1177, *cert. denied,* 423 U.S. 893, 96 S.Ct. 191, 46 L.Ed.2d 124 (1975).

> We have no power to disturb the jury's verdict where it could rationally conclude from the evidence presented and the inferences drawn therefrom that guilt was established beyond a reasonable doubt. *United States v. Turner,* (C.A. 9 1975) 528 F.2d 143, l.c. 162, *cert. denied,* 423 U.S. 996, 96 S.Ct. 426, 46 L.Ed.2d 371 (1975).

The record shows that the jury carefully considered the evidence against Cohen and acquitted him of Counts 8 through 14.

**(L)** *The Advertisements and Films Were Obscene*

■ Appellants next contend that the advertisements and films, subjects of the indictment, were not obscene. This contention is also without merit. We have reviewed the instructions given to the jury, and the applicable precedent, and we conclude that the jury was justified in its finding that the advertisements and films were obscene. Further, this court examined the materials which were adjudged by jury verdict to be obscene, and we are well satisfied

that the standards for determining obscenity under *Miller v. California, supra,* were well met.

**(M, N) Refusal of the Trial Court to Give Two Additional Special Instructions**

 Appellants further allege error in the trial court's refusal to give a special instruction to the effect that entertainment is protected by the First Amendment to the Constitution of the United States. Appellants cite as authority *Zacchini v. Scripps-Howard Broadcasting Co.,* 433 U.S. 562, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977). Without further discussion, we conclude that the *Zacchini* case is wholly inapposite here. Appellants cite no authority in support of the proposition that because a segment of the population might regard obscene material as entertaining, it cannot be forbidden.

Appellants also contend that the jury should have been specially instructed, in determining the applicable community standards regarding obscenity, to consider "the entire northern half of the State of Iowa. . . ." (Appellants' Br. 40). We reiterate that the jury was fully, properly, and correctly instructed regarding the proper standards regarding obscenity in this case.

For the foregoing reasons, the judgments of conviction are affirmed.