No. 80-405

IN THE SUPREME COURT OF THE STATE OF MONTANA

1983

---

THE STATE OF MONTANA,

Plaintiff and Appellant,

-vs-

ROBERT CHARLES JACKSON,

Defendant and Respondent.

---

APPEAL FROM: District Court of the Eighteenth Judicial District,
In and for the County of Gallatin,
The Honorable Joseph B. Gary, Judge presiding.
ON REMAND FROM UNITED STATES SUPREME COURT

COUNSEL OF RECORD:

For Appellant:

Hon. Mike Greely argued, Attorney General, Helena,
Montana
Sarah Power argued, Asst. Atty. General, Helena
A. Michael Salvagni, County Attorney, Bozeman, Montana

For Respondent:

Goetz & Madden; James Goetz argued, Bozeman, Montana

For Amicus Curiae:

Mark Connell; Baldassin, Connell & Beers, Missoula,
Montana (American Civil Liberties Union)

---

Submitted:     May 31, 1983

Decided:     October 21, 1983

Filed: OCT 21 1983

*Ethel M. Harrison*

---
Clerk

Mr. Chief Justice Frank I. Haswell delivered the Opinion of the Court.

This case comes to us for the second time following remand by the United States Supreme Court.

This case began when defendant, Robert Charles Jackson, was charged with driving a motor vehicle while under the influence of alcohol, fourth offense, a misdemeanor, in the District Court of Gallatin County. During the course of prosecution, the District Court entered an order suppressing all evidence of Jackson's refusal to submit to a breathalyzer sobriety test. On appeal, this Court affirmed the District Court in a 4-3 decision.

On application by the State, the United States Supreme Court granted certiorari, reviewed our decision, and entered the following order which we quote in pertinent part:

> "The petition for writ of certiorari is granted. The judgment is vacated and the case is remanded to the Supreme Court of Montana to consider whether its judgment is based upon federal or state constitutional grounds, or both, and, if its judgment is not based upon state constitutional grounds, for further consideration in light of South Dakota v. Neville, 459 U.S. ____, (1983)."

The factual background of this case commenced on June 6, 1980, when Jackson was arrested by Bozeman police for driving under the influence of alcohol. At the police station, he was asked to submit to a breathalyzer test. He refused. This was recorded on videotape together with his performance of certain coordination tests.

Jackson was charged with driving a motor vehicle under the influence of alcohol, fourth offense, in violation of section 61-8-401, MCA. He filed a motion in limine seeking suppression of all evidence of any license suspension resulting from that refusal. The District Court granted

2

suppression, apparently holding that part of Montana's implied consent statute permitting the admission of such evidence unconstitutional.

On appeal, this Court in a split decision affirmed the District Court on the basis that such refusal was testimonial in nature and coerced; hence, admission of such evidence would violate Jackson's right against self-incrimination guaranteed by the Fifth Amendment to the United States Constitution and Article II, Section 25, of the Montana Constitution. State v. Jackson (1981), 195 Mont. 185, 637 P.2d 1.

The Montana Attorney General filed a petition for writ of certiorari seeking a review of our decision by the United States Supreme Court. Thereafter, the United States Supreme Court issued an opinion in a South Dakota case holding that the Fifth Amendment protection against self-incrimination did not prohibit admission in evidence of a person's refusal to take a blood-alcohol sobriety test in a DUI prosecution under South Dakota's implied consent statute. South Dakota v, Neville (1983), 459 U.S. ____, 103 S.Ct. 916, 74 L.Ed.2d 748. Finally, the United States Supreme Court vacated our judgment in the instant case and remanded it to us for further consideration as heretofore set forth.

On remand, we ordered supplemental briefing and heard oral argument on May 31, 1983.

Two issues are presented for our consideration:

1. Was our Jackson decision based on federal or state constitutional grounds, or both?

2. If our Jackson decision was not based on state constitutional grounds, was it overruled by South Dakota v. Neville?

3

The State contends that there are no adequate and independent state constitutional grounds supporting this Court's Jackson/ decision. The State argues that our Jackson opinion rests on an analysis of federal cases construing the Fifth Amendment protection against self-incrimination and no reasons are given in the Jackson opinion for construing Montana's constitutional prohibitions against self-incrimination any differently. The State points to prior decisions of this Court holding that Montana's constitutional provision against self-incrimination affords no broader protection to the accused than does the Fifth Amendment in the United States Constitution.

Jackson contends that this Court in Jackson expressly held that its decision was based on state constitutional grounds as well as federal constitutional grounds. He argues that this Court in Jackson gave reasons for according greater breadth to Montana's constitutional prohibition against self-incrimination than that in the federal constitution by its analysis of cases from other states. Jackson buttresses his argument by pointing out references in Jackson to state constitutional considerations.

The United States Supreme Court has addressed this question on numerous prior occasions to determine its authority to review a state court decision. It is well settled that the United States Supreme Court is the ultimate authority in interpreting provisions of the United States Constitution just as the state supreme court is the ultimate authority in interpreting the provisions of its state constitution. A problem arises when it is unclear whether a state decision is based on the United States Constitution or the state constitution, or both. Essentially, the United

4

States Supreme Court has ruled that unless the state court opinion is based on adequate and independent state grounds, the United States Supreme Court has jurisdiction to review it. Michigan v. Long (1983), ___ U.S. ___, 103 S.Ct. 3469, 77 L.Ed.2d 1201; South Dakota v. Neville, supra; Delaware v. Prouse (1979), 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660; Zacchini v. Scripps-Howard Broadcasting Co. (1977), 433 U.S. 562, 97 S.Ct. 2849, 53 L.Ed.2d 965.

Within this basic framework, the United States Supreme Court has developed more specific guidelines. Where the state supreme court "held as it did because it felt under compulsion of federal law as enunciated by this Court so to hold, it should be relieved of that compulsion. It should be free to decide . . . these suits according to its own local law." Missouri ex rel. Southern R. Co. v. Mayfield (1950), 340 U.S. 1, 5, 71 S.Ct. 1, 95 L.Ed. 3, cited with approval in Zacchini v. Scripps-Howard Broadcasting Co., supra. If the state court "felt compelled by what it understood to be federal constitutional considerations to construe . . . its own law in the manner it did," then the United States Supreme Court will not treat a normally adequate state ground as independent and its jurisdiction is clear. Delaware v. Prouse, 440 U.S. at 653. The essence of the principle applicable to resolution of the issue has recently (July 6, 1983) been summarized in this manner:

> ". . . Accordingly, when, as in this case, a state court decision fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion, we will accept as the most reasonable explanation that the state court decided the case the way it did because it believed that federal law required it to

5

do so. If a state court chooses merely to rely on federal precedents as it would on the precedents of all other jurisdictions, then it need only make clear by a plain statement in its judgment or opinion that the federal cases are being used only for the purpose of guidance, and do not themselves compel the result that the court has reached. . ." Michigan v. Long, 103 S.Ct. at 3476, 77 L.Ed.2d at 1214.

Our original Jackson decision contained statements that to admit evidence of refusal to submit to a breathalyzer sobriety test would violate the Fifth Amendment privilege against self-incrimination and Montana's privilege against self-incrimination guaranteed by Article II, Section 25 of the Montana Constitution. The opinion indicates that the basis of that ruling was that such refusal is testimonial in nature and coerced, thus falling within the ambit of protection against self-incrimination.

As we read the Jackson opinion, that conclusion is reached primarily by an analysis of federal cases interpreting the Fifth Amendment protection against self-incrimination. Schmerber v. California (1966), 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908, is distinguished on the basis that a blood sample is real, physical evidence of a nontestimonial nature beyond Fifth Amendment protection. Doyle v. Ohio (1976), 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91, was cited for the proposition that a person's refusal to take a sobriety test is an overt communication of that person's thoughts, compelled by the police, from which it was reasoned that it was protected against self-incrimination by the Fifth Amendment; a statement follows that under our constitution, the privilege against self-incrimination of an accused person's thoughts, whether by acts or words spoken, and the fact it does not extend its protection to forbid the

6

compulsory exhibition of physical characteristics does not nullify the protection it does provide; Hoffman v. United States (1951), 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118, and Murphy v. Waterfront Comm'n (1964), 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678, were cited as support for a liberal construction of the Fifth Amendment in favor of the accused followed by a statement that we must also liberally construe Article II, Section 25, of the Montana Constitution.

A number of state decisions are cited as examples of state rulings that the admission of evidence of a refusal to take a sobriety test violates the privilege against self-incrimination. Of the state cases cited, four are based on interpretation of the Fifth Amendment to the United States Constitution, one is based on both federal and state constitutions, and two are based exclusively on their own state constitutions (State v. Andrews (Minn. 1973), 212 N.W.2d 863, and Application of Baggett (Okla. 1974), 531 P.2d 1011). No reasons are given in Jackson why we should interpret our own constitution the same as Minnesota and Oklahoma interpreted theirs, nor does the opinion contain any analysis or reason for extending the scope of Montana's constitutional protection against self-incrimination beyond that afforded by its Fifth Amendment counterpart in the federal constitution. The Jackson opinion ignores prior rulings by this Court that the Montana constitutional guarantee of the privilege against self-incrimination affords no broader protection to an accused than does the Fifth Amendment (State v. Armstrong (1976), 170 Mont. 256, 552 P.2d 616) and that the opinion of the United States Supreme Court delineates the maximum breadth of the privilege against

7

self-incrimination in Montana (State v. Finley (1977), 173 Mont. 162, 566 P.2d 1119).

In sum, we read the _Jackson_ opinion as based primarily on United States Supreme Court decisions interpreting the Fifth Amendment to the United States Constitution. Any reference to the state constitution is not independent of the federal constitutional decisions interpreting the Fifth Amendment. No reasons are given nor an analysis made for extending our state constitutional protections against self-incrimination beyond that afforded by its federal counterpart. The following language of the United States Supreme Court in a Michigan case is equally applicable to our _Jackson_ opinion:

> ". . . The references to the state constitution in no way indicate that the decision below rested on grounds in any way _independent_ from the state court's interpretation of federal law. Even if we accept that the Michigan constitution has been interpreted to provide independent protection for certain rights also secured under the Fourth Amendment, it fairly appears in this case that the Michigan Supreme Court rested its decision primarily on federal law." Michigan v. Long, 103 S.Ct. at 3477, 77 L.Ed.2d at 1216.

We now reconsider our _Jackson_ decision in the light of South Dakota v. Neville, supra. In that case Neville was stopped by two Madison, South Dakota, police officers after they saw him fail to stop at a stop sign. The officers asked him for his driver's license and asked him to get out of the car. As Neville left the car, he staggered and fell against the car to support himself. The officers smelled alcohol on his breath. Neville did not have a driver's license and informed the officers that it was revoked after a previous driving-while-intoxicated conviction. The officers asked him

8

to touch his finger to his nose and to walk a straight line. When Neville failed these field sobriety tests, he was placed under arrest and read his _Miranda_ rights. He acknowledged that he understood these rights and agreed to talk without a lawyer present. Reading from a printed card, the officers then asked Neville to submit to a blood-alcohol test and warned him that he could lose his license if he refused. Neville refused to take the test stating, "I'm too drunk, I won't pass the test." The officers again read the request to submit to a test and then took Neville to the police station, where they read the request to submit a third time. Neville continued to refuse to take the test, again saying he was too drunk to pass it.

South Dakota law provides that refusal to submit to a blood-alcohol test "may be admissible into evidence at the trial." Another South Dakota statute specifically provides that evidence of refusal to submit to a chemical analysis of blood, urine, breath or other bodily substance "is admissible into evidence" at a trial for driving under the influence of alcohol and that a person "may not claim privilege against self-incrimination with regard to admission of refusal to submit to chemical analysis."

The trial court granted suppression for three reasons: (1) the South Dakota statute allowing evidence of refusal violated Neville's federal constitutional rights; (2) the officers failed to advise Neville that the refusal could be used against him at the trial; and, (3) the refusal was irrelevant to the issue at the trial. The South Dakota Supreme Court affirmed the suppression on the ground that the statute allowing introduction in evidence of the refusal violated the federal and state privilege against

9

self-incrimination. The South Dakota Supreme Court reasoned that the refusal was a communicative act involving Neville's testimonial capacities and that the state compelled this communication by forcing Neville "to choose between submitting to a perhaps unpleasant examination and producing testimonial evidence against himself." State v. Neville (S.D. 1981), 312 N.W.2d 723, 726.

The United States Supreme Court granted certiorari and upon review reversed the judgment of the South Dakota Supreme Court. The United States Supreme Court held that the admission in evidence of a defendant's refusal to submit to a blood-alcohol test did not offend his Fifth Amendment right against self-incrimination. The Court reasoned that a refusal to take such a test after a police officer has lawfully requested it is not an act coerced by the officer and thus is not protected by the privilege against self-incrimination. The Court reasoned that the offer of taking the test is clearly legitimate and becomes no less legitimate when the state offers a second option of refusing the test with the attendant penalties for making that choice.

The United States Supreme Court went on to hold that it was not fundamentally unfair or in violation of due process to use Neville's refusal to take the blood-alcohol test as evidence of guilt, even though the police failed to warn him that the refusal could be used against him at the trial. The court held that such failure to warn was not the sort of implicit promise to forego use of evidence that would unfairly "trick" Neville if the evidence were later offered against him at the trial.

Montana's implied consent law provides in pertinent part that any person who operates a motor vehicle on the

10

public highways shall be deemed to have given his consent to a chemical test of his blood, breath or urine if arrested by an officer for driving a motor vehicle while under the influence of intoxicating liquor. Section 61-8-402(1), MCA. The statute further provides that if he refuses, no test shall be given but that his driver's license shall be suspended for sixty days under certain circumstances. Section 61-8-402(3), MCA. The implied consent law also provides that proof of refusal to submit to the test is admissible in evidence upon his trial for DUI. Section 61-8-404, MCA.

In the instant case, Jackson is alleged to have refused to submit to a breathalyzer sobriety test. The United States Supreme Court has clearly held that the admission in evidence of a defendant's refusal to submit to a blood-alcohol test in a DUI prosecution does not violate the defendant's Fifth Amendment right against self-incrimination. Since Montana's implied consent law covers a breath test as well as a blood-alcohol test, as does South Dakota's, the Neville case is squarely applicable to Jackson and compels reversal of the District Court's suppression of evidence of refusal on Fifth Amendment grounds.

The Neville decision likewise forecloses defendant's claim that the Montana statute offends Jackson's right against self-incrimination under Montana's Constitution, Article II, Section 25. The Fifth Amendment to the United States Constitution provides, "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . ." while its counterpart in the Montana Constitution provides, "[n]o person shall be compelled to testify against himself in any criminal proceeding." The

11

language used in the two constitutions is substantially identical and affords no basis for interpreting Montana's prohibition against self-incrimination more broadly than its federal counterpart. Nor do we find any indication in the proceedings of Montana's Constitutional Convention that would indicate that the framers intended to grant any broader protection thereunder than that contained in the Fifth Amendment to the United States Constitution.

Moreover, this Court has expressly held to the contrary. "The Montana constitutional guaranty affords no greater protection than that of the Federal constitution." State v. Armstrong, supra, 552 P.2d at 619. A year later we relied on this statement in Armstrong and further held, "[t]he opinions of the United States Supreme Court, therefore, delineate the maximum breadth of the privilege against self-incrimination in Montana." State v. Finley, supra, 566 P.2d at 1121.

Accordingly, we hold that the Montana constitutional prohibition against self-incrimination is not offended by the admission in evidence of defendant's refusal to submit to a breathalyzer sobriety test pursuant to section 61-8-404, MCA.

We do not reach the question of whether evidence of defendant's license suspension is admissible. Although that issue was included in defendant's motion in limine, it was neither briefed nor argued in the District Court nor in this Court on appeal.

The order of the District Court suppressing evidence of Jackson's refusal to submit to a breathalyzer sobriety test is reversed. This cause is remanded to the District Court of Gallatin County for further proceedings.

_____
Chief Justice

12

We concur:

_____
John Cornelius Harrison

_____
J. C. Gulbrandson

_____

_____

_____
Justices

13

Mr. Justice Frank B. Morrison, Jr. specially concurring.

I concur in the result. Originally my vote was to find the subject statute unconstitutional as a violation of Jackson's right against self-incrimination. At that time my vote was not based upon independent State grounds but rather upon my own interpretation of the Fifth Amendment to the United States Constitution and Article II, Section 25 of the Montana Constitution. Furthermore, I tried to determine what the United States Supreme Court would do when confronted with the question.

My feeling is that where language in the Montana State Constitution is identical to language in the United States Constitution, we should feel bound by determinations made by the United States Supreme Court in interpreting that language. Therefore, though I disagree with the decision of the United States Supreme Court, my vote is to follow their interpretation.

Justice

14

Mr. Justice John C. Sheehy, dissenting:

I dissent.

In our original opinion in this case, we had examined the rights guaranteed our citizens under state constitutional principles, in the light of federal constitutional decisions. Now the United States Supreme Court has interjected itself, commanding us in effect to withdraw the constitutional rights which we felt we should extend to our state citizens back to the limits proscribed by the federal decisions. Effectively, the United States Supreme Court has intruded upon the rights of the judiciary of this sovereign state.

Instead of knuckling under to this unjustified expansion of federal judicial power into the perimeters of our state power, we should show our judicial displeasure by insisting that in Montana, this sovereign state can interpret its constitution to guarantee rights to its citizens greater than those guaranteed by the federal constitution.

I agree with Justice Stevens, who dissented in Michigan v. Long (Decided July 6, 1983) No. 82-256, ____ U.S. ____. We can paraphrase what his majority has done to Montana by quoting from his dissent:

> "In this case the State of [Montana] has arrested one of its citizens and the [Montana] Supreme Court has decided to turn him loose. The respondent is a United States citizen as well as a [Montana] citizen, but since there is no claim that he has been mistreated by the State of [Montana], the final outcome of the state processes offended no federal interest whatever. [Montana] simply provided greater protection to one of its citizens than some other State might provide or, indeed, than this Court might require throughout the country." Slip opinion at 4.

What Justice Stevens is saying, and I am glad to echo, is that the United States Supreme Court has no business contravening the final decisions of a state judiciary where

-15-

no federal right guaranteed to all citizens has been offended. Constitutional rights are guaranteed to persons, not states. Here the State has complained to the United States Supreme Court because its own state judiciary has protected the constitutional rights of one of its citizens, and extended those rights beyond what the State perceives as the federal limits. It has always been the rule that the states could extend federal constitutional rights past the boundaries of the federal limitations as defined by the federal judiciary, but could not delimit such constitutional rights to a lesser degree than would be permitted under federal rules. In other words, the United States Supreme Court historically has intervened to make sure that persons who seek to <u>vindicate</u> federal rights have been fairly heard. Historically, as Justice Stevens pointed out, the United States Supreme Court reviewed the findings of fact of a state court, only "where a federal right has been denied." Slip opinion at 5.

No federal rights of a citizen were <u>denied</u> in our original opinion in this case.

The general public may have a perception that courts operate in a degree of permanency, interpreting constitutions and laws unchangingly. That perception is most misleading. The shades of opinion and the quality of a court's interpretations are transient, depending in large measure upon the changing personnel making up the court, and the ability of its members to withstand the tides of public opinion. The most illustrative example of this transiency is the United States Supreme Court itself. Its vagaries of opinions in the fields of civil rights, human rights, education, and the rights of states in the past 20 years must

be astounding to any student of judicial history. The result of the decision in Michigan v. Long will be, as Justice Stevens said, a swelling increase in the number of cases the United States Supreme Court will be called on to interpret, where states complain that their own judiciaries have granted greater rights than the federal decisions have allowed. The great likelihood is that the United States Supreme Court must in the future reverse its position and adopt a stance that adequate state grounds for its decision are independent of federal grounds unless it clearly appears from the state's opinion otherwise. We should at least attempt to force the United States Supreme Court to come to that proper stance.

If a majority of this Court had the will to press the issue, we could put the question to the United States Supreme Court four-square, that this State judiciary has the right to interpret its constitution in the light of federal decisions, and to go beyond the federal decisions in granting and preserving rights to its citizens under its state constitution. That is the route I would take in this case.


John G. Sheehy
Justice

-17-

Mr. Justice Daniel J. Shea, dissenting:

I join in Justice Sheehy's dissent and add my own dissent to the decision of the majority to undo what we declared the law to be in State v. Jackson (1981), 195 Mont. 185, 637 P.2d 1. (In this dissent, I refer to our 1981 Jackson decision as Jackson I and to the present decision as Jackson II.) I dissent not because I believe opinions I have authored are cast in granite, but because the majority here has ignored the full import of our decision in Jackson I, the import of which they fully recognized in their dissent. We held that not only were the defendant's constitutional rights violated under the Fifth Amendment to the United States Constitution, but also and as an independent ground, [that defendant's rights were violated under the self-incrimination of Art. II, § 25 of our own state constitution.] In the guise of compliance with the mandate of the United States Supreme Court's order of remand vacating our judgment, the majority has simply rewritten Jackson to comport with its own views as to interpreting our state constitution. In doing so, the majority has delegated to the United States Supreme Court our duty to interpret our constitution. This constitutes an abdication of our duty to interpret our own constitution.

Before launching into the body of my dissent, I detour here to comment on the current trends to crack down on drunk driving. Those trends are laudable and every effort to do so is a step in the right direction--provided that no constitutional rights are violated in the process. In South Dakota v. Neville (1983), ___ U.S. ___, 103 S.Ct. 916, 74 L.Ed.2d 748, the United States Supreme Court referred to the

carnage of our highways as a result of drunk driving. No one can deny the tragic statistics relating to drinking and driving. However, the criminal law does not have to be enforced in such a manner as to cause a head-on confrontation with either the Fifth Amendment or Art. II, § 25 of our own constitution. Driving is a privilege, and that privilege can be revoked. I see nothing unconstitutional in a law providing that if a driver (on reasonable probable cause) is asked by a law officer to give a blood alcohol sample or a breath sample and refuses to do so, his license can be suspended. The refusal can be the triggering event for suspension. However, if the State chose, it could still proceed against the defendant on a charge of driving while intoxicated. In the criminal proceeding, however, the State should not be able to use the defendant's refusal against him as a tacit admission that his refusal was based on his belief that he could not pass the test. That, in my judgment, violates at least Art. II, § 25 of our own constitution, and that is what I thought we held in Jackson I.

As the author of Jackson I, I clearly made a mistake, for I did not recognize the extent to which the United States Supreme Court stood ready to intrude on the judicial affairs of this state in interpreting our own constitution. However, the remand order failed to analyze our decision, for to have done so would have been to recognize that we did indeed rely on Art. II, § 25, as an independent ground of decision. Instead, the Supreme Court remanded the case to this Court to determine whether our decision "was based upon federal or state constitutional grounds, or both,. . ." (Emphasis added.) A reading of our decision should have told an objective United States Supreme Court that our decision was

based on both and that a decision based on our own constitution was sufficient for that Court to deny certiorari.

In his dissent from the majority's remand order, however, Justice Stevens did take the time to analyze this Court's decision in Jackson I, and he was eminently satisfied that we clearly based our decision on an independent state ground by relying on Art. II, § 25 of our own constitution. I quote Justice Steven's dissent in full so that the reader can make his or her own determination of whether this Court reached its decision on an independent state ground.

"Justice Stevens, dissenting.

"In its opinion explaining its holding that the defendant's refusal to submit to a breathalizer sobriety test is inadmissible, the majority of the Supreme Court of Montana stated, in part:

"'We hold that such refusal is testimonial in nature and that to admit evidence of the fact of refusal would violate the defendant's Fifth Amendment privilege as guaranteed by the United States Constitution, and would further violate defendant's privilege as guaranteed by Art. II, § 25 of the Montana Constitution.' App. to Pet. for Cert. A-2.

"After analyzing the federal constitutional question in the light of this Court's opinion in Schmerber v. California, 384 U.S. 757, the court continued:

"'The issue is also controlled by Art. II, § 25 of our own constitution, which provides that "no person shall be compelled to testify against himself in a criminal proceeding." The issue involves a communication that is testimonial in nature, and we must resolve the issue by applying Art. II, § 25. Clearly, to permit evidence of defendant's refusal to take the breathalyzer test would violate not only the United States Constitution, but also our own constitution.'

"'In State v. Finley (1977), 173 Mont. 162, 566 P.2d 1119, we held that a defendant's privilege against self-incrimination was not violated by admitting into evidence a videotape recording of his post-arrest words and actions. We decided that the tape had not been introduced for the incriminating content of the words uttered by the

- 20 -

defendant, but rather for the purpose of aiding the jury in understanding the testimony of the witnesses who had observed the defendant's unsteady walk and his slurred speech after his arrest. We specifically noted that the videotape did not contain incriminating responses to interrogation by the police. But the same situation does not exist here. It is obvious that defendant's refusal is inherently self-incriminating because it carries a strong inference of guilt--the prosecutor would surely argue that defendant's refusal to take the test was prompted only by his knowledge that the test results would reveal his intoxication, and therefore incriminate him.'

"'We hold under our own constitution, that if a communication of refusal, whether written, verbal, or otherwise, involves the defendant's consciousness of the facts and the operation of his mind in expressing it, the communication is testimonial in nature. A defendant's silence or negative reply to an officer's request which calls for an immediate reply is clearly an overt communication of the defendant's thoughts in response to the request. Doyle v. Ohio (1976), 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91. It is the act of refusal that is pertinent and suggestive of guilt, rather than the way in which it is communicated. Under our constitution, the privilege against self-incrimination forbids any compulsory communication of an accused person's thoughts, whether by acts or words spoken, and the fact that it does not extend its protection to forbid the compulsory exhibition of physical characteristics does not nullify the protection it does provide.' App. to Pet. for Cert. A-8-A-10.

"Consistent with the views I expressed in dissent in South Dakota v. Neville, ___ U.S. ___, ____ (1983), I believe the statements I have quoted are sufficient to demonstrate that the judgment of the Montana Supreme Court rests on an adequate and independent state ground and that this Court is therefore without jurisdiction to vacate its judgment. I therefore respectfully dissent."

In unfortunate statements in two previous cases this Court declared that the Montana constitutional provision against self-incrimination would march lock-step with interpretation given to the Fifth Amendment clause of the United States Constitution. State v. Finley (1977), 173 Mont. 162, 566 P.2d 1119; State v. Armstrong (1976), 170 Mont. 256, 552 P.2d 616. Although the majority in Jackson II now again rely on these statements, they recognized full well

- 21 -

in dissenting to Jackson I that the intent of the majority was to give greater protection in Montana than what the federal constitution provided. The dissent states in part:

". . . It [the majority holding] extends the breadth of Montana's constitutional provision beyond that afforded by the United States Constitution and overrules sub silento this Court's own interpretation of Montana's own interpretation of Montana's privilege against self-incrimination [obviously referring to the statements in Armstrong and Finley that Montana's constitutional provision against self-incrimination had only the meaning that the United States Supreme Court chose to give to it.]" 195 Mont. at 196, 637 P.2d at 7.

There, the dissenters recognized that Armstrong and Finley had been overruled to the extent that we would let the United States Supreme Court interpret Art. II, § 25 of our own constitution for us. But the present majority in Jackson II, now sings a different tune. They conclude, without alluding to their own admissions in Jackson I, our constitutional provision against self-incrimination must derive its sole meaning from decisions of the United States Supreme Court interpreting the Fifth Amendment.

Before I became a member of this Court and since I have been a member of this Court, I have been constantly bothered by the inconsistency of this Court in its decisions, but particularly so in the administration of the criminal law where even more consistency is required because of the underlying life and liberty considerations involved with each case. The majority opinion here demonstrates once again this inconsistency and our unstated policy to treat each criminal appeal on an ad hoc basis. This unstated policy undermines the integrity of the appellate process and as a matter of judicial policy is just plain dangerous.

This result could not have been reached--in this case--if the United States Supreme Court had not arrogated to itself the powers that should, in our federal system, belong

- 22 -

only to the states. I once again state that I agree with the concerns of Justice Sheehy in his dissent, for his concerns are real.

The danger of this intrusionary policy is fully exemplified by the arrogance of a concurring opinion in Florida v. Casal (Fla.S.Ct., June 17, 1983), No. 81-2318, slip op. There the United States Supreme Court let stand a decision of the Florida Supreme Court that appeared to have relied on a state constitutional provision and state statute in reaching its decision. But the Chief Justice of the United States Supreme Court did not agree with the decision of the Florida Supreme Court and suggested that the United States Supreme Court was the sole repository of judicial wisdom and rationality.

In the final paragraph of this concurring opinion, the Chief Justice expressed an attitude that fully reflects the judicial power that he would arrogate for the United States Supreme Court:

> "With our dual system of state and federal laws, administered by parallel state and federal courts, different standards may arise in different areas. But when state courts interpret state law to require more than the Federal Constitution requires, the citizens of the state must be aware that they have the power to amend state law to ensure rational law enforcement. The people of Florida have now done so with respect to Art. 1, § 12 of the State Constitution; they have it within their power to do so with respect to Florida Statute § 327.56 [the statute involved that was interpreted by the Florida Supreme Court contrary to what the Chief Justice believed its interpretation should be.]." Florida v. Casal, supra, at 3 (Burger, J., concurring) (Emphasis added.)

This philosophy appears to have permeated a majority of the members of that Court and I suggest that this philosophy is what led to the remand in this case. The Chief Justice would have state governments amend state constitutions and

- 23 -

statutes to march lock-step with the judicial pronouncements of the United States Supreme Court. It appears that this philosophy is contagious. The majority here has declared that Art. II, § 25, of our own constitution has only the meaning that the United States Supreme Court chooses to give it.

I suggest that the provisions of our own constitution do have meaning independent of the interpretations given to the United States Constitution, and that so long as we do not deny rights guaranteed by the United States Constitution, we can and should, where the situation arises, interpret our own constitution to give more rights than those granted by the United States Constitution. But the majority has abdicated that responsibility by holding that provisions of our constitution "substantially identical" (whatever that means) with provisions of the United States Constitution can get their meaning only from the United States Supreme Court. It seems the majority has adopted the philosophy suggested by Chief Justice Burger in Florida v. Casal,[5] and would permit the United States Supreme Court to tell us what our state constitution means.

Based on these considerations, I would reaffirm our opinion in Jackson I, an opinion that not only attempted to interpret the United States Constitution, but also relied on a state ground in affirming the trial court's order.

Daniel J. Shea
Justice

- 24 -